Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Max Gershenoff (MG 4648)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY CO.,

Docket No.:  14-cv-5277

                            Plaintiffs,

**Plaintiffs Demand a
Trial by Jury**

            -against-

SPECTRUM NEUROLOGY GROUP, LLC,
OMEGA NEUROLOGICAL ASSOCIATES, LLC,
MERIDIAN RADIOLOGY ASSOCIATES, LLC,
PROGRESSIVE DIAGNOSTIC, INC.,
CLEAR IMAGE, INC.,
PREMIER PROFESSIONAL SERVICES, LLC,
COMPREHENSIVE MEDICAL GROUP, LLC,
PREMIER HEALTH SERVICES, LLC,
THE NEURO GROUP, LLC,
NEW WAVE DIAGNOSTIC, LLC,
PALMER MEDICAL, PC, NEUROLOGY &
RADIOLOGY PARTNERS, PA,
AMERICAN NEUROLOGY & RADIOLOGY, PA,

            -and-

BRAD GOLDSTEIN, LAURENCE RUBIN, DENA
GOLDSTEIN, GLEN SKOLNIK, SUSAN EBY, SUSAN
WHITNEY, DAVE MANTOR, MELISSA MANTOR,
RUSSELL PACKARD

            -and-

SANFORD DAVIS, ALEXANDER LANDFIELD,
SAMANTHA MENDELSON, NIZAR SOUAYAH,
KEVIN CONNOR,  MELVIN GROSSMAN,
KEVIN DRAKE,

                              Defendants.

----------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO"), by and through their undersigned counsel, as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      This action seeks to recover more than $877,000.00 that the Defendants have stolen from GEICO by submitting, and causing to be submitted, thousands of fraudulent New York no-fault insurance charges related to medically unnecessary diagnostic tests, including nerve conduction velocity ("NCV") tests, somatosensory evoked potential ("SSEP") tests, and spinal ultrasound tests (collectively, the "Fraudulent Diagnostic Tests"), that allegedly have been provided to New York automobile accident victims by corporations that (i) are not authorized to render or bill for healthcare services in New York; (ii) are engaged in illegal fee splitting and kickback arrangements; and (iii) exist solely to financially enrich the Defendants and defraud GEICO and other New York automobile insurers.

2.      The Defendants have engaged in a series of inter-related schemes to profit from the Fraudulent Diagnostic Tests allegedly provided to GEICO insureds ("Insureds"), by submitting charges to GEICO under the names of a myriad of ever-changing, mostly foreign, corporate entities, including Defendants Progressive Diagnostic, Inc., Clear Image, Inc.,

2

Spectrum Neurology Group, LLC, Omega Neurological Associates, LLC, Meridian Radiology Associates, LLC, Premier Professional Services, LLC, Comprehensive Medical Group, LLC, Premier Health Services, LLC, The Neuro Group, LLC, New Wave Diagnostic, LLC, Palmer Medical, P.C., Neurology & Radiology Partners, P.A., and American Neurology & Radiology, P.A. (collectively, the "Corporate Provider Defendants"). The Corporate Provider Defendants purport to be separate and independently owned corporations providing healthcare services to patients in New York State, but the Corporate Provider Defendants often have common individuals listed as owners, purport to provide services at many of the same locations, have identical relationships with an overlapping group of referring providers, utilize many of the same out-of-state neurologists to "interpret" the Fraudulent Diagnostic Tests (collectively, the "Interpreting Defendants"), often use the same medical forms and mailing addresses, and generally operate and bill for the same Fraudulent Diagnostic Tests in the same manner.

3.      The Corporate Provider Defendants are variously owned, operated and/or controlled by Defendants Brad Goldstein, Laurence Rubin, Dena Goldstein, Glen Skolnik, Susan Eby, Susan Whitney, Dave Mantor, Melissa Mantor, and Russell Packard, among others (collectively, the "Layperson Defendants"). The Layperson Defendants continually create new corporate entities to bill for the Fraudulent Diagnostic Tests, "mix and match" their association with each other and with the Corporate Provider Defendants, and attempt to conceal their ownership, operation and/or control over the Corporate Provider Defendants in order to avoid detection and conceal the series of inter-related fraudulent schemes from GEICO and other insurers.

4.      GEICO, in addition to seeking to recover the monies stolen from it, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,825,000.00 in

pending no-fault insurance claims that have been submitted by or on behalf of the Corporate

Provider Defendants, as controlled by the Layperson Defendants, because:

(i)     the Corporate Provider Defendants are not authorized or properly licensed to render or bill for healthcare services in New York and, therefore, are ineligible to bill for or collect no-fault benefits;

(ii)    the Defendants engaged in unlawful fee-splitting, kickback, and illegal referral arrangements in violation of New York law in connection with the Fraudulent Diagnostic Tests purportedly rendered under the names of the Corporate Provider Defendants and, therefore, the Corporate Provider Defendants are ineligible to bill for or collect no-fault benefits;

(iii)   the Fraudulent Diagnostic Tests have not been medically necessary and have been provided – to the extent that they have been provided at all – solely to financially enrich the Defendants, rather than to treat or otherwise benefit the GEICO insureds who purportedly were subjected to them;

(iv)    the Fraudulent Diagnostic Tests, in many cases, have been interpreted by persons not authorized to render healthcare services in New York, to the extent the tests have been interpreted at all;

(v)     the Fraudulent Diagnostic Tests, in the vast majority of cases, have been interpreted by independent contractors in violation of New York's no-fault insurance laws and regulations, to the extent the tests have been interpreted at all.

5.      The Defendants fall into the following categories:

(a)     The Corporate Provider Defendants are domestic and foreign corporations,

foreign limited liability companies, and foreign and domestic professional service corporations

through which the Fraudulent Diagnostic Tests purportedly are performed and billed to insurance

companies, including GEICO.   The Corporate Provider Defendants are not authorized or

properly licensed to render or bill for healthcare services in New York.

(b)     The Layperson Defendants are the owners, operators and/or controllers of

the Corporate Provider Defendants.

(c)     The Interpreting Defendants are healthcare professionals who purportedly

interpret the Fraudulent Diagnostic Tests that are billed through the Corporate Provider

4

Defendants to GEICO.  These healthcare professionals neither reside in nor physically practice in New York, but nonetheless purport to treat New York patients.

6.      The Defendants do not now have, and never had, any right to be compensated for the bills they have submitted, or caused to be submitted, to GEICO.  The charts annexed hereto as Exhibits "1" through "12" summarize, in part, the fraudulent charges identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.  The Defendants' inter-related fraudulent schemes also continue to the present. As a result of the Defendants' scheme, GEICO has incurred damages of more than $877,000.00.

## PARTIES

### I.      Plaintiffs

7.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in the State of New York.

### II.     Defendants

#### A.      The Corporate Provider Defendants

8.      Defendant Progressive Diagnostic, Inc. ("Progressive") is a Florida corporation with its principal place of business in Weston, Florida, and was incorporated on or about February 11, 1998.

9.      Progressive is owned, operated and/or controlled by Laurence Rubin.

10.     Progressive is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

11.     Defendant Clear Image, Inc. ("Clear Image") is a New York corporation with its principal place of business in Wantagh, New York, and was incorporated on or about July 9, 2010.

12.     Clear Image is owned, operated and/or controlled by Laurence Rubin.

13.     Defendant Spectrum Neurology Group, LLC ("Spectrum") is a Florida limited liability company with its principal place of business in Boca Raton, Florida, and was formed on or about November 21, 2012.

14.     Spectrum is owned, operated and/or controlled by Brad Goldstein.

15.     Spectrum is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

16.     Defendant Omega Neurological Associates, LLC ("Omega") is a Texas limited liability company with its principal place of business in Boca Raton, Florida. Omega was formerly known as Spectrum Neurological Group, LLC, which was formed in Texas on November 18, 2011, but then changed its name to Omega on February 23, 2012.

17.     Omega is owned, operated and/or controlled by Brad Goldstein.

18.     Omega shares the same tax identification number used by Spectrum.

19.     Omega is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

20.     Defendant Meridian Radiology Associates, LLC ("Meridian") is a Florida limited liability company with its principal place of business in Boca Raton, Florida, and was formed on November 28, 2011.

21.     Meridian is owned, operated and/or controlled by Brad Goldstein.

22.     Meridian is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

23.     Defendant Premier Professional Services, LLC ("Premier Professional") is a Delaware limited liability company with its principal place of business in Boca Raton, Florida, and was formed on or about February 23, 2004.

24.     Premier Professional, upon information and belief, is currently owned by the Banyan Corporation (a now defunct entity), Cory Gelmon, and Michael Gelmon, but has been owned, operated and/or controlled by Brad Goldstein at relevant times.

25.     Premier Professional is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

26.     Defendant Comprehensive Medical Group, LLC ("Comprehensive Medical") is a Florida limited liability company with its principal place of business in Boca Raton, Florida, and was formed on or about February 15, 2002.

27.     Comprehensive Medical, upon information and belief, is currently owned by the Banyan Corporation (a now defunct entity), Cory Gelmon, and Michael Gelmon, but has been owned, operated and/or controlled by Brad Goldstein at relevant times.

28.     Comprehensive Medical is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

29.     Defendant Premier Health Services, LLC ("Premier Health") is a Delaware limited liability company with its principal place of business in Boca Raton, Florida, and was formed on or about February 23, 2004.

30.   Premier Health, upon information and belief, is currently owned by the Banyan Corporation (a now defunct entity), Cory Gelmon, and Michael Gelmon, but has been owned, operated, and/or controlled by Dena Goldstein and Brad Goldstein at relevant times.

31.   Premier Health is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

32.   Defendant the Neuro Group, LLC ("the Neuro Group") is a Florida limited liability company with its principal place of business in Boca Raton, Florida, and was formed on or about June 22, 2012.

33.   The Neuro Group is owned, operated and/or controlled by Glenn Skolnik.

34.   Defendant New Wave Diagnostics, LLC ("New Wave") is a Nevada limited liability company with its principal place of business in Boca Raton, Florida, and was formed on or about September 17, 2007.

35.   New Wave is owned, operated and/or controlled by Susan Eby, Susan Whitney, Melissa Mantor, and David Mantor.

36.   New Wave is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

37.   Defendant Palmer Medical P.C. ("Palmer") is a purported New York professional service corporation with its principal place of business in Boca Raton, Florida, incorporated on July 8, 2013, and owned as of record by Alexander Landfield, M.D.

38.   Palmer, although nominally owned on paper by Alexander Landfield, M.D., in actuality always has been owned, operated and controlled by Brad Goldstein.

8

39.     Defendant Neurology & Radiology Partners, P.A. ("Neurology & Radiology Partners") is a Texas professional association with its principal place of business in Boca Raton, Florida, and was formed on or about June 28, 2012.

40.     Neurology & Radiology Partners is owned by Russell Packard – a neurologist not licensed to practice in New York.

41.     Neurology & Radiology Partners is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

42.     Defendant American Neurology & Radiology, P.A. ("American Neurology") is a Florida professional association with its principal place of business in Boca Raton, Florida, and was formed on or about June 27, 2012.

43.     American Neurology is owned by Russell Packard – a neurologist not licensed to practice in New York.

44.     American Neurology is not authorized to do business in New York, but has submitted billing for services purportedly provided to New York Insureds.

**B.      The Layperson Defendants**

45.     Defendant Laurence Rubin ("Rubin") is an unlicensed, non-professional who resides in and is a citizen of Florida.

46.     Rubin owns, operates and/or controls Progressive and Clear Image, and has otherwise knowingly conducted and/or participated, directly or indirectly, in the conduct of their affairs.   He submits, causes to be submitted, and directs the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through Progressive and Clear Image to GEICO.

47.     Defendant Brad Goldstein ("Goldstein") is an unlicensed, non-professional who resides in and is a citizen of Florida.

9

48.     Goldstein owns, operates and/or controls Spectrum, Omega, Meridian, and Palmer, and at relevant times, Premier Professional, Comprehensive Medical, and Premier Health, and has otherwise knowingly conducted and/or participated, directly or indirectly, in the conduct of their affairs.  He submits, causes to be submitted, and directs the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through Spectrum, Omega, Meridian, Palmer, Premier Professional, Comprehensive Medical, and Premier Health to GEICO.

49.     Defendant Dena Goldstein ("Dena") is an unlicensed, non-professional who resides in and is a citizen of Florida.

50.     Dena, at relevant times, had owned, operated and/or controlled Premier Health and has otherwise knowingly conducted and/or participated, directly or indirectly, in the conduct of its affairs.  During relevant times, she submitted, caused to be submitted, and directed the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through Premier Health.

51.     Defendant Glenn Skolnik ("Skolnik") is an unlicensed, non-professional who resides in and is a citizen of Florida.

52.     Skolnik owns, operates, and/or controls the Neuro Group.  He submits, causes to be submitted, and directs the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through the Neuro Group to GEICO.

53.     Defendant Susan Eby ("Eby") is an unlicensed, non-professional who resides in and is a citizen of Florida.

54.     Eby owns, operated and/or controls New Wave.  She submits, causes to be submitted, and directs the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through New Wave to GEICO.

55.     Defendant Susan Whitney ("Whitney") is an unlicensed, non-professional who resides in and is a citizen of Florida.

56.     Whitney owns, operates and/or controls New Wave.  She submits, causes to be submitted, and directs the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through New Wave to GEICO.

57.     Defendant Melissa Mantor ("Mrs. Mantor") is an unlicensed, non-professional who resides in and is a citizen of Florida.

58.     Mrs. Mantor owns, operates and/or controls New Wave.  She submits, causes to be submitted, and directs the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through New Wave to GEICO.

59.     Defendant David Mantor ("Mr. Mantor") is an unlicensed, non-professional who resides in and is a citizen of Florida.

60.     Mr. Mantor owns, operates and/or controls New Wave.  He submits, causes to be submitted, and directs the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through New Wave to GEICO.

61.     Defendant Russell Packard ("Packard") is a neurologist who resides in and is a citizen of Texas. He is not licensed to practice medicine in New York.

62.     Packard owns, operates and/or controls Neurology & Radiology Partners and American Neurology.  He interprets the Fraudulent Diagnostic Tests rendered by Neurology & Radiology Partners and American Neurology, as well as submits, causes to be submitted, and

11

directs the submission of the Fraudulent Diagnostic Tests and the coinciding fraudulent bills through Neurology & Radiology Partners and American Neurology to GEICO.

### C.  The Interpreting Defendants

63.     Defendant Sanford Davis ("Davis") is a New York licensed physician who resides in and is a citizen of Florida.

64.     Davis purports to interpret the Fraudulent Diagnostic Tests that are billed through Progressive, Clear Image, Spectrum, Omega, Meridian, Premier Professional, Premier Health, and the Neuro Group to GEICO.

65.     Davis maintains an active practice in Florida, and, at all relevant times, has been associated with Clear Image, Progressive, Spectrum, Omega, Meridian, Premier Professional, Premier Health, and the Neuro Group as an independent contractor, rather than as an employee.

66.     Defendant Samantha Mendelson ("Mendelson") is a New York licensed physician who resides in and is a citizen of Florida.

67.     Mendelson purports to interpret the Fraudulent Diagnostic Tests that are billed through Progressive, Clear Image, Spectrum, Omega, Meridian, Premier Professional, and Premier Health to GEICO.

68.     Mendelson maintains an active practice in Florida, and, at all relevant times, has been associated with Progressive, Clear Image, Spectrum, Omega, Meridian, Premier Professional, and Premier Health as an independent contractor, rather than as an employee.

69.     Defendant Nizar Souayah ("Nizar") is a New York licensed physician who resides in and is a citizen of New Jersey.

70.     Nizar purports to interpret the Fraudulent Diagnostic Tests that are billed through the Neuro Group and New Wave to GEICO.

12

71.    Nizar maintains an active practice in New Jersey, and, at all relevant times, has been associated with the Neuro Group and New Wave as an independent contractor, rather than as an employee.

72.    Defendant Alexander Landfield ("Landfield") resides in and is a citizen of Kentucky. Landfield is licensed to practice medicine in New York.

73.    Landfield is the nominal or "paper" owner of Defendant Palmer, and purports to interpret many of the Fraudulent Diagnostic Tests that are billed through Meridian and Palmer to GEICO.

74.    Landfield maintains an active practice in Texas, and, at all relevant times, has been associated with Meridian as an independent contractor, rather than as an employee.

75.    Defendant Kevin Connor ("Connor") is a neurologist who resides in and is a citizen of Texas.  Connor is not licensed to practice medicine in New York.

76.    Connor purports to interpret the Fraudulent Diagnostic Tests that are billed through Spectrum and Omega to GEICO.

77.    Connor maintains an active practice in Texas, and, at all relevant times, has been associated with Spectrum and Omega as an independent contractor, rather than as an employee.

78.    Defendant Melvin Grossman ("Grossman") is a New York licensed physician who resides in and is a citizen of Florida.  Grossman's New York license is currently inactive.

79.    Grossman purports to interpret the Fraudulent Diagnostic Tests that are billed through Progressive to GEICO.

80.    Grossman maintains an active practice in Florida, and, at all relevant times, has been associated with Progressive as an independent contractor, rather than as an employee.

13

81.     Defendant Kevin Drake ("Drake") is a New York licensed physician who resides in and is a citizen of California. Drake's New York license is currently inactive.

82.     Drake purports to interpret the Fraudulent Diagnostic Tests that are billed through Neurology & Radiology Partners to GEICO.

83.     Drake maintains an active practice in California, and, at all relevant times, has been associated with Neurology & Radiology Partners as an independent contractor, rather than as an employee.

## JURISDICTION AND VENUE

84.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 through 1968 (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

85.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.     **An Overview Of The No-Fault Laws**

86.     GEICO underwrites automobile insurance in New York.

87.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 through 5109) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65-1.1 through 65-4.11) (collectively, the "No-Fault Laws"), automobile insurers

14

are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to individuals involved in New York automobile accidents ("Insureds").

88.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

89.     An Insured can assign the right to No-Fault Benefits to healthcare providers. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered by using the claim form required by the New York State Department of Insurance (known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

90.     Pursuant to the No-Fault Laws, healthcare providers are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

91.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health[care] services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

92.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

93. Pursuant to New York's Education Law, only New York licensed healthcare professionals are authorized to render healthcare services in New York. N.Y. EDUC. LAW §§ 6500, *et al*.

94. Pursuant to New York Business Corporation Law, New York Penal Law, and New York Limited Liability Company Law, it is illegal to render healthcare services through a corporation or a limited liability company. N.Y. BUS. CORP. LAW § 201; N.Y. PENAL LAW § 280; 1935 N.Y. Ops Atty Gen 240.

95. Healthcare services may be rendered in New York through a *professional* service corporation only if every shareholder of that professional service corporation is licensed in New York to practice the professional service corporation's authorized profession. N.Y. BUS. CORP. LAW § 1503.

96. Healthcare services may be rendered in New York through a foreign *professional* service corporation only if every shareholder of that foreign professional service corporation is licensed to practice the foreign professional service corporation's authorized profession in New York and the original jurisdiction. N.Y. BUS. CORP. LAW § 1530.

97. Healthcare services may be rendered in New York through a foreign *professional* service limited liability company where every manager/owner of that foreign professional service limited liability company is licensed to practice the foreign professional service limited liability company's authorized profession in New York and the original jurisdiction. N.Y. LTD. LIAB. CO. LAW § 1306.

98. In consequence, in New York, only a New York licensed healthcare professional may: (i) practice in a healthcare profession; (ii) own and control an entity authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv)

absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.  Hence, in New York, individuals without New York licenses may not: (i) practice in a healthcare profession; (ii) own or control an entity authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

99.    Pursuant to New York Education Law, healthcare providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting or kickback arrangements with unlicensed individuals, entities, or any person not a partner, employee, or associate within the healthcare provider. N.Y. EDUC. LAW § 6530.

100.    Pursuant to New York Education Law, healthcare providers are not eligible to receive No-Fault Benefits if they bill for healthcare services rendered by healthcare professionals not licensed in New York, or if they bill for healthcare services rendered by healthcare professionals whose New York licenses are inactive. N.Y. EDUC. LAW § 6530.

101.    In general, the New York statutory and regulatory framework relating to the provision of healthcare services provides that a healthcare provider is not eligible to receive No-Fault Benefits if it is a business corporation, limited liability company, fraudulently incorporated, not authorized or properly licensed to provide healthcare services, if it engages in unlawful fee-splitting with unlicensed non-professionals or persons not within the same firm, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if it bills for healthcare services rendered by healthcare professionals who are not authorized to practice in New York.

102.    Moreover, pursuant to New York Education Law, anyone not licensed to practice healthcare services in New York who practices or offers to practice or holds himself out as being

17

able to practice healthcare services in New York is guilty of a class E felony. N.Y. Educ. Law § 6512(1).

103.   In addition, New York Business Corporation Law provides that any foreign company doing business in New York without having received a certificate of authority to do business in New York may not maintain any action, suit, or special proceeding in any court of New York unless and until that company applies for and receives a certificate of authority from New York. N.Y. Bus. Corp. Law § 1312.

104.   Finally, pursuant to Section 403 of the New York State Insurance Law, all NF-3s submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

105.   Defendants, motivated solely by financial gain, and by means of the fraud described herein, subject GEICO's Insureds to the Fraudulent Diagnostic Tests using an array of ever-changing corporate entities – the Corporate Provider Defendants – to avoid detection and continue the flow of profits from their fraudulent schemes.   Both the Corporate Provider Defendants and the Layperson Defendants are not authorized to render or bill for healthcare services in New York State.   Nevertheless, they improperly use the façade of an ever-changing mix of corporate entities with healthcare-sounding names to mislead GEICO and other insurers into paying them, so that they can illegally derive profit from healthcare services in New York State that by law must be provided by appropriately licensed professional corporations and licensed physicians.

106.    Defendants, in order to generate referrals and receive a steady supply of patients on whom to perform their medically unnecessary tests, split fees and pay illegal referral fees and kickbacks to healthcare providers in New York, primarily chiropractors, who are lured into the scheme by the promise of a "no-cost" program to increase their practices' profits.

107.    Defendants further effectuate their schemes by using mobile technicians paid by the Corporate Provider Defendants to travel around to the offices of New York-based chiropractors and other healthcare providers (the "Referring Practitioners"), where they provide (or purport to provide) the medically unnecessary and worthless Fraudulent Diagnostic Tests on patients of the Referring Practitioners, without supervision by a physician trained in diagnostic testing.

108.    Thereafter, out-of-state neurologists or other physicians paid by the Corporate Provider Defendants purport to interpret the Fraudulent Diagnostic Tests.

109.    Defendants then use one of an array of ever-changing Corporate Provider Defendants to bill GEICO for thousands of dollars per Insured.

110.    The Corporate Provider Defendants are owned by the Layperson Defendants, who are various unlicensed, non-professionals.  The Corporate Provider Defendants are typically incorporated or formed outside New York and generally consist of business corporations, limited liability companies, or professional service corporations – which are not authorized to render or bill for healthcare services in New York.

111.    The Corporate Provider Defendants, as owned and controlled by the Layperson Defendants, enter into purported "lease agreements" with the Referring Practitioners, which are nothing more than disguised kickbacks and payments for referrals that are prohibited by New York law.

112.    The unlawful kickback relationships that the Defendants establish with the Referring Practitioners are essential to the success of the Defendants' fraudulent scheme. The Defendants derive significant financial benefit from the relationships because without the access to the Insureds provided by the Referring Practitioners, the Defendants would not have the ability to implement their fraudulent treatment and billing protocol, bill automobile insurers including GEICO, or generate income from insurance claim payments.

113.    The Referring Practitioners likewise benefit from their unlawful kickback relationships with the Defendants, not only because of the financial benefit conferred by the kickbacks themselves, but also because the fraudulent treatment reports generated by the Defendants are used by the Referring Practitioners to support the continuation of their own medically-unnecessary services to the Insureds.

114.    The Interpreting Defendants are independent contractors living and practicing outside of New York who interpret the Fraudulent Diagnostic Tests under the names of the Corporate Provider Defendants.  They also recommend treatments that New York Insureds purportedly should undergo. While some of the Interpreting Defendants are licensed to practice healthcare services in New York, some of them are either not licensed in New York or their New York license is inactive.

115.    GEICO recently began investigating certain of the Corporate Provider Defendants based on the submission of suspect billing for the Fraudulent Diagnostic Tests, along with indications that the Corporate Provider Defendants were not authorized to render healthcare services in New York and/or were engaged in illegal fee splitting and kickback arrangements. Defendants, however, have utilized a scheme of closing down any corporate entity that receives

scrutiny by GEICO and setting up new corporate entities to conceal the fraud, avoid detection, and keep the illicit profits flowing.

116.    Defendants continue this scheme despite knowing, at all relevant times, that:

(i)      the Corporate Provider Defendants are not authorized or properly licensed to render or bill for healthcare services in New York and, therefore, are ineligible to bill for or collect No-Fault Benefits;

(ii)     the Defendants engaged in unlawful fee-splitting, kickback, and illegal referral arrangements in violation of New York law in connection with the Fraudulent Diagnostic Tests purportedly rendered under the names of the Corporate Provider Defendants and, therefore, the Corporate Provider Defendants are ineligible to bill for or collect No-Fault Benefits;

(iii)    the Fraudulent Diagnostic Tests have not been medically necessary and have been provided – to the extent that they have been provided at all – solely to financially enrich the Defendants, rather than to treat or otherwise benefit the GEICO Insureds who purportedly were subjected to them;

(iv)    the Fraudulent Diagnostic Tests, in many cases, have been interpreted by persons not authorized to render healthcare services in New York, to the extent the tests have been interpreted at all;

(v)     the Fraudulent Diagnostic Tests, in the vast majority of cases, have been interpreted by independent contractors in violation of the No-Fault law and regulations, to the extent the tests have been interpreted at all; and

(vi)    the documents submitted by the Defendants in support of the charges for the Fraudulent Diagnostic Tests, as well as the billing that the Defendants submitted seeking payment from GEICO, are false and misleading in several material respects.

117.    Defendants have stolen more than $877,000.00 from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault charges for the Fraudulent Diagnostic Tests.  Defendants' various, inter-related, schemes are set forth below.

### A.   Spectrum's, Omega's, Meridian's, Premier Professional's, Comprehensive Medical's, Premier Health's, The Neuro Group's, And New Wave's Illegal Practice Of Healthcare Services In New York

118.    Defendants Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave are foreign limited liability

companies that illegally provide and bill for neurological and radiological diagnostic testing (i.e. the Fraudulent Diagnostic Tests) to New York Insureds in New York.

119.   In New York, it is illegal for limited liability companies and foreign limited liability companies to provide healthcare services.  Accordingly, limited liability companies and foreign limited liability companies are ineligible to bill for or collect No-Fault Benefits. Additionally, in New York, it is illegal for a foreign professional service limited liability company to provide healthcare services unless all managers/owners are licensed in New York to practice the company's authorized healthcare profession. As such, only foreign professional service limited liability companies whose managers/owners are all licensed in New York to practice the company's authorized healthcare profession are eligible to bill for or collect No-Fault Benefits

120.   Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave are owned, controlled, and/or directed by unlicensed, non-professionals, all of whom reside outside the State of New York.

121.   Specifically, Spectrum is owned, controlled, and/or directed by Goldstein; Omega is owned, controlled, and/or directed by Goldstein; Meridian is owned, controlled, and/or directed by Goldstein; Premier Professional is currently owned by the Banyan Corporation, Cory, and Michael, but was previously owned, controlled, and/or directed by Goldstein; Comprehensive Medical is currently owned by the Banyan Corporation, Cory, and Michael, but was previously owned, controlled, and/or directed by Goldstein; Premier Health is currently owned by the Banyan Corporation, Cory, and Michael, but was previously owned, controlled, and/or directed by Dena and Goldstein; the Neuro Group is owned, controlled, and/or directed by

22

Skolnik; and New Wave is owned, controlled, and/or directed by Eby, Whitney, Mrs. Mantor, and Mr. Mantor.

122.    Despite not being permitted to do so, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave provided and billed for health services in New York to patients injured and residing in New York, through the technicians and Interpreting Defendants.

123.    In fact, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave bill GEICO for the Fraudulent Diagnostic Tests.

124.    Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave are foreign limited liability companies that have at no time been authorized to provide healthcare services in New York.

125.    Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave have at no time been owned by, controlled by, or even employed a healthcare professional who was licensed to provide healthcare services in New York.

126.    Nevertheless, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group submit, and cause to be submitted, thousands of fraudulent no-fault insurance charges related to the Fraudulent Diagnostic Tests to GEICO.

127.    Further, Spectrum and Omega consistently bill GEICO for healthcare services performed by Connor, a neurologist not licensed to render healthcare services in New York.

128.    At bottom, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave illegally provide healthcare services

23

in New York because they are not licensed or authorized by New York to provide healthcare services in this state. They also render healthcare services in an illegal corporate form and/or illegally render services using physicians not licensed in New York State.

129. Accordingly, Spectrum, Omega, Meridian, the Neuro Group, and New Wave are ineligible to bill for or collect No-Fault Benefits.

**B. Neurology & Radiology Partners' And American Neurology's Illegal Practice Of Healthcare Services In New York**

130. Defendants Neurology & Radiology Partners and American Neurology are professional associations that were formed outside of New York, and which illegally provide neurological and radiological diagnostic testing (i.e. the Fraudulent Diagnostic Tests) to New York Insureds, in New York.

131. In New York, it is illegal for a professional service corporation to provide healthcare services unless all shareholders are licensed in New York to practice the professional service corporation's authorized profession. Accordingly, only professional service corporations whose shareholders are all licensed in New York to practice the professional service corporation's authorized profession are eligible to bill for or collect No-Fault Benefits. Additionally, in New York, it is illegal for a foreign professional service corporation to provide healthcare services unless all shareholders are licensed in New York to practice the foreign professional service corporation's authorized profession. As such, only foreign professional service corporations whose shareholders are all licensed in New York to practice the foreign professional service corporation's authorized profession are eligible to bill for or collect No-Fault Benefits.

132.    Defendants Neurology & Radiology Partners and American Neurology are professional associations formed outside of New York, which are considered foreign professional service corporations under New York law.  N.Y. Bus. Corp. Law § 1525.

133.    Neurology & Radiology Partners and American Neurology are owned, controlled, and/or directed by Packard, a neurologist who is not licensed to provide healthcare services in New York.

134.    Despite being not permitted to do so, Neurology & Radiology Partners and American Neurology are providing healthcare services in New York to patients injured and residing in New York, through the technicians and Interpreting Defendants.

135.    In fact, Neurology & Radiology Partners and American Neurology bill GEICO for the Fraudulent Diagnostic Tests.

136.    Further, Packard himself interprets some of the Fraudulent Diagnostic Tests provided to New York Insureds in New York by Neurology & Radiology Partners and American Neurology, even though he is not licensed to practice medicine in New York.

137.    At no time have Neurology & Radiology Partners and American Neurology been authorized to provide healthcare services in New York.

138.    At no time have Neurology & Radiology Partners and American Neurology been owned by, controlled by, or even employed a healthcare professional who was licensed to provide healthcare services in New York.

139.    Nevertheless, Neurology & Radiology Partners and American Neurology submit, and cause to be submitted, fraudulent no-fault insurance charges related to the Fraudulent Diagnostic Tests to GEICO.

25

140.    At bottom, Neurology & Radiology Partners and American Neurology illegally provide healthcare services in New York because they are not licensed or authorized by New York to provide healthcare services in this state and/or illegally render services using physicians not licensed in New York State.

141.    Accordingly, Neurology & Radiology Partners and American Neurology are ineligible to bill for or collect No-Fault Benefits.

### C.    Clear Image's And Progressive's Illegal Practice Of Healthcare Services In New York

142.    Defendant Clear Image is a New York corporation that illegally subjects New York Insureds to the Fraudulent Diagnostic Tests, in New York.

143.    Defendant Progressive is a Florida corporation that illegally subjects New York Insureds to the Fraudulent Diagnostic Tests, in New York.

144.    In New York, it is illegal for (non-professional) corporations to provide healthcare services. Accordingly, (non-professional) corporations are ineligible to bill for or collect No-Fault Benefits.

145.    Clear Image and Progressive are owned, controlled, and/or directed by unlicensed, non-professional Rubin for the sole purpose of submitting, and causing to be submitted, fraudulent billing for the Fraudulent Diagnostic Tests to insurance companies, including GEICO.

146.    Despite not being permitted to do so, Clear Image and Progressive are providing healthcare services in New York to patients injured and residing in New York, through the technicians and Interpreting Defendants.

147.    In fact, Clear Image and Progressive bill GEICO for the Fraudulent Diagnostic Tests.

148. At no time has Clear Image or Progressive been authorized to provide healthcare services in New York.

149. At no time has Clear Image or Progressive been owned by, controlled by, or even employed a healthcare professional who was licensed to provide healthcare services in New York.

150. Nevertheless, Clear Image and Progressive submit, and cause to be submitted, hundreds of fraudulent no-fault insurance charges related to the Fraudulent Diagnostic Tests to GEICO.

151. Further, Progressive consistently bills GEICO for services rendered by Grossman, a neurologist with an inactive New York license.

152. At bottom, Clear Image and Progressive illegally provide healthcare services in New York because Clear Image and Progressive are not licensed or authorized by New York to provide healthcare services. Clear Image and Progressive also render healthcare services in an illegal corporate form and/or illegally render services using physicians not actively licensed in New York State.

153. Accordingly, Clear Image and Progressive are ineligible to bill for or collect No-Fault Benefits.

**D.    Palmer's Illegal Practice Of Healthcare Services In New York**

154. Recently, certain of the Layperson Defendants have sought to further their scheme to bill for the Fraudulent Diagnostic Tests purportedly rendered to New York Insureds by illegally creating, owning, and controlling a professional medical corporation, incorporated in New York.

155. In 2013, Goldstein, an unlicensed, non-professional, recruited and convinced Landfield, a neurologist residing in Kentucky who had been interpreting the Fraudulent

27

Diagnostic Tests for Meridian, to use his New York license to fraudulently incorporate Palmer. Once incorporated, Landfield turned over full control of this professional corporation to Goldstein, who then used Palmer to submit large-scale fraudulent billing to insurers.

156.    Specifically, in order to circumvent New York Law and to induce the State Education Department to issue a certificate of authority authorizing Palmer to practice neurology and radiology, Goldstein entered into a secret scheme with Landfield.  In exchange for a designated salary or other form of compensation, in 2013, Landfield agreed to falsely represent in the certificate of incorporation filed with the Department of Education that he is the true shareholder, director, and officer of Palmer and that he truly owns, controls, and practices through Palmer.  Landfield did this knowing full well that Palmer would be used as a vehicle to submit fraudulent billing to insurers.

157.    Once Palmer was fraudulently incorporated, Landfield ceded true beneficial ownership and control over Palmer to Goldstein.

158.    Landfield never has been the true shareholder, director, or officer of Palmer, and never has had any true ownership interest in or control over Palmer.  True ownership and control over Palmer has rested at all times entirely with Goldstein, who has used the façade of Palmer to do indirectly what he was forbidden from doing directly: charge for and derive economic benefit from the services of neurologists and radiologists.

159.    Throughout the course of Landfield's relationship with Goldstein, all decision-making authority relating to the operation and management of Palmer has been vested entirely with Goldstein.  In addition, Landfield has never controlled or maintained any of Palmer's books or records; never selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of Palmer's financial affairs; never supervised any of

28

Palmer's employees or independent contractors; and has been completely unaware of the most fundamental aspects of how Palmer has operated.

160.    Landfield does not physically practice or live in New York.

161.    In reality, Landfield resides in Kentucky and merely interprets the Fraudulent Diagnostic Tests that have been rendered at the direction of Goldstein.

162.    Accordingly, Palmer is fraudulently incorporated and is, thus, ineligible to bill for or collect No-Fault Benefits.

**E.    The Fraudulent Kickbacks And Payments For Referrals**

163.    The Corporate Provider Defendants have no fixed treatment locations of any kind, do not maintain stand-alone practices, are not the owners of the real property from which they purport to provide the Fraudulent Diagnostic Tests, and do not advertise or market their services to the general public.

164.    The Corporate Provider Defendants, as owned, operated and/or controlled by the Layperson Defendants, have no patient base and no ability to attract patients on their own.

165.    Instead, the Defendants obtain access to Insureds for the Corporate Provider Defendants through the payment of kickbacks from the Defendants to the Referring Practitioners.

166.    The Corporate Provider Defendants, as owned, operated and/or controlled by the Layperson Defendants, solicit the Referring Practitioners by making promises of a "no-cost" method for them to make money, which in fact requires no cost and no participation by the Referring Practitioners beyond the referral of their patients to the Corporate Provider Defendants in return for a kickback or payment for the referral.

167.    In some cases, the kickbacks that the Defendants pay to the Referring Practitioners are disguised as legitimate lease agreements to "rent" space or personnel from the Referring Practitioners or entities owned or controlled by the Referring Practitioners.

168.    In other cases, the kickbacks that the Defendants pay to the Referring Practitioners are disguised as agreements to permit the Referring Practictioners to bill for some component of the Fraudulent Diagnostic Tests, despite the fact that the Referring Practitioners have no genuine role in the performance of the Fraudulent Diagnostic Tests.

169.    In fact, these are nothing more than "pay-to-play" arrangements that cause the Referring Practitioners to provide access to, and steer Insureds to, the Corporate Provider Defendants.

**F.      The Defendants' Fraudulent Treatment And Billing Protocol**

        1.      The Defendants' Fraudulent Ultrasound Test Charges

170.    The Defendants' Fraudulent Diagnostic Tests that allegedly have been provided to New York automobile accident victims include spinal/paraspinal ultrasound tests.

171.    An ultrasound is a noninvasive imaging technique that relies on detection of the reflections or echoes generated as high-frequency sound waves are passed into the body. Physicians commonly use this technique for a number of imaging purposes such as investigation of abdominal and pelvic masses, cardiac echocardiography, and prenatal fetal imaging.

172.    There is no support for the use of spinal/paraspinal ultrasound tests in the evaluation of patients with back pain or radicular symptoms. The procedure is worthless and of no clinical value in the manner used by Defendants to purportedly diagnose and treat Insureds presenting with back pain or radicular symptoms, allegedly caused by auto accidents.

173.    The American Institute of Ultrasound Medicine ("AIUM"), which consists of thousands of healthcare professionals and is dedicated to advancing the safe and effective use of

ultrasound medicine, determined that "the use of non-operative spinal/paraspinal ultrasound in adults . . . for diagnostic evaluation, for evaluation of pain or radiculopathy syndromes, and for monitoring the therapy has no proven clinical utility." See Exhibit "13."

174.    The American Academy of Neurology (AAN) issued a report that evaluated the use of spinal ultrasound for diagnosing back pain and radicular disorders. The report concluded that there is no support for the use of diagnostic ultrasound in the evaluation of patients with back pain or radicular symptoms. The procedure cannot be recommended for use in the clinical evaluation of such patients. See Exhibit "14."

175.    Despite the lack of medical value or utility in the context of No-Fault auto accident victims suffering spinal/paraspinal injuries, the Defendants have submitted, or caused to be submitted, hundreds of thousands of dollars in bills for spinal and paraspinal ultrasound tests to GEICO, as part of the Fraudulent Diagnostic Tests.

176.    Defendants' spinal/paraspinal ultrasound tests are medically unnecessary, if not completely useless for the purposes billed to GEICO – and Defendants are fully aware of this – thus, these tests are ineligible for reimbursement under the No-Fault Laws.

177.    The Defendants purport to provide and bill for the spinal/paraspinal ultrasound tests knowing full well that they are medically unnecessary and worthless and, thus, the Defendants do not have, and never had, any right to bill for or collect No-Fault Benefits.

2.      The Defendants' Fraudulent SSEP Test Charges

178.    The Defendants' Fraudulent Diagnostic Tests that allegedly have been provided to New York automobile accident victims include Somatosensory Evoked Potentials ("SSEPs").

179.    SSEPS are forms of electro diagnostic tests, and purportedly have been provided by the Defendants to the Insureds because they have been medically necessary to determine whether the Insureds had neuromuscular disorders.

180.    SSEP tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The potentials – brain waves – evoked by this electrical stimulation then are recorded by electrodes over the spine and attached to the scalp.

181.    SSEP tests are medically necessary only in limited instances in which an individual suffers from severe spinal impairment (spinal stenosis), and – in such cases – solely for the purpose of determining where within the spinal canal the patient requires decompression surgery, or as an intra-operative guide during spine surgery.  One of the most common uses of SSEP is as a diagnostic test for multiple sclerosis, which is not caused by trauma.

182.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electro diagnostic medicine in the diagnosis of various forms of neuropathies. The Recommended Policy accurately reflects the demonstrated utility of various forms of electro diagnostic tests, and has been endorsed by two premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.   See Recommended Policy annexed hereto as Exhibit "15."

183.    According to the Recommended Policy, SSEP tests have no documented usefulness in diagnosing non-severe spinal injuries.

184.    The Recommended Policy does not endorse SSEP tests for use in diagnosing mild spinal injuries.

185.    The Recommended Policy does not recommend SSEP tests for use in diagnosing radiculopathies. See Exhibit "15." Consistent with the Recommended Policy, the New York

State Workers' Compensation Board, Neck Injury Medical Treatment Guidelines also establish that SSEPs are not useful in diagnosing radiculopathies. See Exhibit "16."

186.    SSEP tests are medically necessary only in limited instances in which an individual suffers from severe spinal impairment in which spinal cord injury is involved, and – in such cases – solely for the purpose of determining where within the spinal canal the patient requires decompression surgery, or as an intra-operative guide during the course of spine surgery and in the diagnosis of multiple sclerosis.

187.    Nonetheless, the Defendants routinely purport to provide SSEPs to Insureds, supposedly for use in diagnosing minor injuries stemming from minor, "fender-bender" car accidents.

188.    Even if SSEPs had any clinical utility in diagnosing mild spinal injuries – which they do not – the decision whether to use them to test the nerves running from the arms or legs to the brain should be tailored to each patient's unique circumstances. As a result, the type of SSEPs performed should vary from patient-to-patient.

189.    The Defendants routinely do not tailor the SSEPs that they purport to provide to the unique circumstances of any Insured.  Instead, when the Defendants purport to provide SSEPs, they do so in a cookie-cutter fashion to financially enrich themselves.

190.    The Defendants purport to provide and bill for SSEPs knowing full well that they are medically unnecessary, worthless, and provided in cookie-cutter fashion without regard for the actual needs of the patients and, thus, the Defendants do not have, and never had, any right to bill for or collect No-Fault Benefits.

3.    The Defendants' Fraudulent EMG/NCV Testing

191.    The Defendants' Fraudulent Diagnostic Tests that allegedly have been provided to New York automobile accident victims include electromyography ("EMGs") and nerve

conduction velocity ("NCVs") tests – although the Corporate Provider Defendants (excepting Palmer) routinely performed only NCV tests.

192.    The NCVs and EMGs are forms of electro-diagnostic tests, and purportedly have been provided by the Defendants to the Insureds because they have been medically necessary to determine whether the Insureds had neuromuscular disorders.

(i)   NCV Testing

193.    NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity"). In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform". The amplitude, latency, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

194.    In instances of suspected radiculopathy, where NCVs and EMGs are necessary to diagnose nerve damage, they should be performed together.    According to the AANEM's Recommended Policy, both EMG and NVC tests normally are required for a clinical diagnosis of peripheral nervous system disorders.  See Exhibit "15."  As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
> …

34

The [electrodiagnostic] laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances." Id.

195. Despite the Recommended Policy, the Corporate Provider Defendants (excepting Palmer) routinely performed only NCV tests. See Exhibit "15."

196. For instance:

(i) Progressive submitted a July 18, 2009 bill to GEICO for reimbursement for an NCV test performed on an Insured named Patient 1. Progressive, however, never sought reimbursement from GEICO for an EMG test for Patient 1.

(ii) Clear Image submitted a March 14, 2011 bill to GEICO for reimbursement for an NCV test performed on an Insured named Patient 2. Clear Image, however, never sought reimbursement from GEICO for an EMG test for Patient 2.

(iii) Spectrum submitted a November 1, 2012 bill to GEICO for reimbursement for an NCV Test performed on an Insured named Patient 3. Spectrum, however, never sought reimbursement from GEICO for an EMG test for Patient 3.

(iv) Meridian submitted a December 8, 2012 bill to GEICO for reimbursement for an NCV Test performed on an Insured named Patient 4. Meridian, however, never sought reimbursement from GEICO for an EMG test for Patient 4.

(v) Premier Professional submitted an April 28, 2011 bill to GEICO for reimbursement for an NCV Test performed on an Insured named Patient 5. Premier Professional, however, never sought reimbursement from GEICO for an EMG test for Patient 5.

(vi) Comprehensive Medical submitted a May 4, 2004 bill to GEICO for reimbursement for an NCV Test performed on an Insured named Patient 6. Comprehensive Medical, however, never sought reimbursement from GEICO for an EMG test for Patient 6.

(vii) Premier Health submitted a January 21, 2012 bill to GEICO for reimbursement for an NCV Test performed on an Insured named patient 7. Premier Health, however, never sought reimbursement from GEICO for an EMG test for Patient 7.

(viii) The Neuro Group submitted a May 7, 2013 bill to GEICO for reimbursement for an NCV Test performed on an Insured named Patient 8. The Neuro Group, however, never sought reimbursement from GEICO for an EMG test for Patient 8.

(ix)     New Wave submitted a June 26, 2012 bill to GEICO for reimbursement for an NCV Test performed on an Insured named Patient 9. New Wave, however, never sought reimbursement from GEICO for an EMG test for Patient 9.

(x)      Neurology & Radiology Partners submitted a January 18, 2013 bill to GEICO for reimbursement for an NCV Test performed on an Insured named Patient 10. Neurology & Radiology Partners, however, never sought reimbursement from GEICO for an EMG test for Patient 10.

(xi)     American Neurology submitted a March 1, 2013 bill to GEICO for reimbursement for an NCV Test performed on an Insured named Patient 11. American Neurology, however, never sought reimbursement from GEICO for an EMG test for Patient 11.

197.    The Defendants, as a matter of course, fail to provide EMG tests together with the NCV tests, which renders the NCV test medically useless and unnecessary.

198.    Furthermore, the Defendants do not even properly or legitimately assess the Insureds for NCV testing or tailor the NCVs that they purport to perform or provide to the unique circumstances of each individual Insured.

199.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCVs.  Most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.  In a legitimate clinical setting, the decision of which peripheral nerves to test is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCVs are performed on particular peripheral nerves and their sensory and/or motor fibers.  As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCVs should vary from patient-to-patient.

200.    The Corporate Provider Defendants, however, do not tailor the NCVs that they performed or purported to provide to the unique circumstances of each individual Insured.

201. In fact, the NCVs provided by the Corporate Provider Defendants to Insureds were provided by technicians, without adequate supervision, without the presence of any of the Interpreting Defendants, and without regard for the actual need for the test.

202. The Defendants' cookie-cutter approach to the NCVs that they performed or provided to GEICO Insureds clearly was not based on medical necessity. Instead, the Defendants' cookie-cutter approach to the NCVs was designed solely to maximize the charges that the Corporate Providers could submit to GEICO and other insurers.

(ii)   EMG Testing

203. EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specified location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

204. According to the Recommended Policy, "the diagnostic interpretation of the needle EMG examination takes place during the performance of the test" and that "needle EMG studies [should be] interpreted in real time, as they are being performed." Hence, according to the Recommended Policy, the only person capable of interpreting a needle EMG examination is the physician performing the test.

205. In the finite circumstances where the Defendants actually perform EMG testing, the EMG tests have not been interpreted in real time by the physician conducting the test. Rather, the EMG tests performed by the Defendants have been interpreted days later by the Interpreting Defendants in other states.

206. Indeed, virtually all Defendants, at one time or another, have added a form to the bills submitted to GEICO stating, in all capitalization, that "WE DO NOT SEE THE PATIENT.

WE ONLY PERFORM THE READING OF THE TESTS AND ONLY HAVE TEST RESULTS."

207.   On that basis, the EMG tests that have purportedly been interpreted by the Interpreting Defendants were destined to be worthless and thus medically unnecessary. To that end, the EMG tests that have purportedly been interpreted by the Interpreting Defendants are ineligible for reimbursement under the No Fault Laws.

**G.     The Fraudulent Billing For Independent Contractors**

208.   The Defendants' fraudulent scheme includes submission of billing to GEICO seeking payment for services provided by independent contractors. Under the No-Fault Laws, healthcare providers are ineligible to bill for or receive payment for services provided by independent contractors – the healthcare services must be provided by the providers themselves, or their employees.

209.   Since 2001, the New York State Department of Insurance (now the New York State Department of Financial Services) consistently has reaffirmed its longstanding position that healthcare providers are not entitled to receive reimbursement under the No-Fault Laws for healthcare professionals performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("[W]here the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services . . . ."); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in February 21, 2001 Opinion Letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf

of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act . . . ."); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS). (Copies of these Opinion Letters are collectively annexed hereto as Exhibit "17.")

210. Not only do the Defendants routinely bill for medically useless tests that are performed pursuant to kickbacks and according to a pre-determined, fraudulent treatment protocol, but the Defendants also – in nearly every case – bill for services that are performed by independent contractors, rather than by the Corporate Provider Defendants' employees.

211. Only the bills that have been submitted to GEICO through Neurology & Radiology Partners and American Neurology for the Fraudulent Diagnostic Tests that have been interpreted by Packard are – assuming every other prerequisite of coverage is satisfied – reimbursable because Packard owns Neurology & Radiology Partners and American Neurology.

212. Besides that, all of the Fraudulent Diagnostic Tests that have been billed to GEICO through the Corporate Provider Defendants have been interpreted – to the extent that they have been interpreted at all – by the Interpreting Defendants or other neurologists and radiologists.

213. The Interpreting Defendants and every other neurologist and radiologist who has purported to interpret the Fraudulent Diagnostic Tests for the Corporate Provider Defendants have been treated by the Provider Defendants as independent contractors.

214. Despite this, in the billing that the Defendants submit or cause to be submitted to GEICO through the Corporate Provider Defendants, the Defendants routinely misrepresent the

Interpreting Defendants and other neurologist/radiologist who purport to interpret the Fraudulent Diagnostic Tests for the Defendants as the employees of the Corporate Provider Defendants.

215.    In actuality, the Defendants treat the Interpreting Defendants and every other neurologist/radiologist who has purported to interpret the Fraudulent Diagnostic Tests as independent contractors in an effort to avoid paying taxes, worker's compensation, and meeting other legal obligations.

216.    Indeed, the majority of the Interpreting Defendants run their own full-time medical practices that have no relation to the Corporate Provider Defendants.

217.    Because the Interpreting Defendants and other neurologist/radiologist who supposedly interpret the Fraudulent Diagnostic Tests that are billed to GEICO through the Corporate Provider Defendants are independent contractors, the Defendants do not have, and never had, any right to bill for or collect No-Fault Benefits in connection with those services.

**H.     The Unauthorized Collections Lawsuits Brought By Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology, And American Neurology**

218.    New York law provides that any foreign company doing business in New York without having received a certificate of authority to do business in New York may not maintain any action, suit, or special proceeding in any court of New York unless and until that company applies for and receives a certificate of authority from New York.

219.    Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology Partners, and American Neurology are foreign companies doing business in New York.

220.    Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology Partners, and American Neurology have not received a certificate of authority to do business in New York.

221.    Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology Partners, and American Neurology pursue collection of the fraudulent charges billed to GEICO by filling expensive and time-consuming litigation and arbitration against GEICO if the charges for the Fraudulent Diagnostic Tests are not promptly paid in full.

222.    Because Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology Partners, and American Neurology have not received a certificate of authority to do business in New York, Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology Partners, and American Neurology may not maintain any action, suit, or special proceeding in any court of New York.

223.    As a result, every litigation and arbitration brought by Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology Partners, and American Neurology against GEICO is and was improper and must be dismissed.

### III.    The Defendants' Submission Of Fraudulent NF-3 Forms To GEICO

224.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 Forms) consistently have been submitted to GEICO by and on behalf of the Corporate Provider Defendants seeking payment for services for which the Corporate Provider Defendants are ineligible to receive payment.

41

225.    The NF-3 Forms submitted to GEICO by the Defendants and on behalf of the

Corporate Provider Defendants are false and misleading in the following material respects:

(i)     The NF-3 Forms uniformly misrepresent to GEICO that the Corporate Provider
Defendants are lawfully licensed, and therefore, eligible to receive No-Fault
Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-
3.16(a)(12). Instead, the Corporate Provider Defendants are not lawfully licensed
because they are not authorized to render or bill for healthcare services in New
York.

(ii)    The NF-3 Forms uniformly misrepresent to GEICO that the Corporate Provider
Defendants are lawfully licensed, and therefore, eligible to receive No-Fault
Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-
3.16(a)(12). Instead, the Corporate Provider Defendants are not lawfully licensed
in that they unlawfully pay kickbacks, illegally split fees, and unlawfully make
payments for patient referrals.

(iii)   The NF-3 Forms routinely misrepresent to GEICO that Progressive, Spectrum,
Omega, Neurology & Radiology Partners, and American Neurology are eligible
to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11
N.Y.C.R.R. § 65-3.16(a)(12) for the Fraudulent Diagnostic Tests that are
submitted to GEICO. Instead, Progressive, Spectrum, Omega, Neurology &
Radiology Partners, and American Neurology are not eligible to seek or pursue
collection of No-Fault Benefits because the Fraudulent Diagnostic Tests are
interpreted by professionals not authorized to render healthcare services in New
York.

(iv)    The NF-3 Forms uniformly misrepresent to GEICO that the Fraudulent
Diagnostic Tests are medically necessary. Instead, the Fraudulent Diagnostic
Tests are not medically necessary, are worthless as employed by Defendants, and
are performed – to the extent that they are performed at all – pursuant to
kickbacks that the Defendants pay to referring providers and pursuant to a pre-
determined fraudulent protocol designed solely to financially enrich the
Defendants.

(v)     The NF-3 Forms uniformly misrepresent to GEICO that the Corporate Provider
Defendants are eligible to receive No-Fault Benefits pursuant to Insurance Law §
5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the Fraudulent Diagnostic Tests that
are performed. Instead, in the vast majority of cases, the Fraudulent Diagnostic
Tests are not interpreted by the Corporate Provider Defendants' employees.

IV. **The Defendants' Fraudulent Concealment And GEICO's Justifiable Reliance**

226.   The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

227.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Diagnostic Tests, the Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment by, among other things, engaging in inter-related schemes under the names of a myriad of ever-changing corporate entities.

228.   In fact, the Defendants knowingly misrepresent and conceal facts related to Clear Image, Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave in an effort to prevent discovery that these companies have been owned, controlled, and managed by unlicensed, non-professionals and are not authorized to render of bill for healthcare services in New York.  The Defendants also knowingly misrepresent and conceal facts in an effort to prevent discovery that these companies pay illegal kickbacks and fee splits and, therefore, are ineligible to bill for and collect No-Fault Benefits.  Further, the Defendants misrepresented and concealed the fact that the owners/managers of Clear Image, Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, the Neuro Group, and New Wave have not been licensed to provide healthcare services in New York.

229.   In addition, the Defendants knowingly misrepresent and conceal facts related to Neurology & Radiology Partners and American Neurology in an effort to prevent discovery that these foreign professional service corporations are owned and controlled by a neurologist not licensed to provide healthcare services in New York. The Defendants also knowingly misrepresent and conceal facts in an effort to prevent discovery that these two foreign professional corporations pay illegal kickbacks and fee splits and, therefore, are ineligible to bill

43

for or collect No-Fault Benefits. To illustrate, the Defendants misrepresented that Packard was licensed to practice neurology in New York when it billed GEICO. This deceit induced GEICO to mistakenly pay bills that were ineligible for reimbursement.

230. The Defendants also knowingly misrepresent and conceal facts related to Palmer in an effort to prevent discovery that Palmer was unlawfully incorporated, owned, and controlled by unlicensed, non-professionals. The Defendants also knowingly misrepresent and conceal facts in an effort to prevent discovery that Palmer pays illegal kickbacks and fee splits and, therefore, is ineligible to bill for or collect No-Fault Benefits. Additionally, the Defendants operate Palmer in a manner designed to – and in fact did – conceal the true ownership of Palmer.

231. To this end, in every bill that the Defendants submit or cause to be submitted, the Defendants uniformly misrepresent that the Corporate Provider Defendants are authorized and properly licensed to provide healthcare services in New York and thus eligible to bill for and collect No-Fault Benefits, when in fact they were not.

232. Also in every bill that the Defendants submit or cause to be submitted, the Defendants uniformly misrepresent that the Corporate Provider Defendants are owned and controlled by healthcare professionals licensed to provide healthcare services in New York and thus eligible to bill for and collect No-Fault Benefits, when in fact they were not.

233. In addition, the Defendants knowingly misrepresent and conceal facts in order to prevent GEICO from discovering that the Defendants derive patient referrals through kickbacks and fee splitting. Indeed, the Defendants enter into complex financial arrangements with the Referring Practitioners that have been designed to, and did, conceal the nature of the kickbacks and illegal financial arrangements.

234. Furthermore, the Defendants knowingly misrepresent and conceal facts in order to prevent GEICO from discovering that the Fraudulent Diagnostic Tests are medically unnecessary and are performed pursuant to a fraudulent, pre-determined protocol designed to maximize the charges that can be submitted.

235. Likewise, the Defendants knowingly misrepresent and conceal facts in order to prevent GEICO from discovering that the Fraudulent Diagnostic Tests are frequently interpreted by healthcare professionals not authorized to render healthcare services in New York.

236. Moreover, the Defendants knowingly misrepresent and conceal facts related to the employment status of the Interpreting Defendants and other neurologists/radiologists who are associated with the Corporate Provider Defendants in order to prevent GEICO from discovering that the Interpreting Defendants and other neurologists/radiologists are not employed by the Corporate Provider Defendants.

237. What is more, the Defendants create and purport to practice through multiple healthcare providers with different names and tax identification numbers (sometimes using overlapping numbers) in order to intentionally cause confusion and reduce the amount of billing submitted through any single healthcare provider, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

238. The Defendants hire law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

239. GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty days. The facially valid, verified documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and

fraudulent litigation activity described above, have been designed to and has caused GEICO to rely upon them. As a result, GEICO has incurred damages of more than $877,000.00 based upon payments made by GEICO in reliance on the fraudulent charges that the Defendants submitted or caused to be submitted.

240. GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

241. In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely denied the pending claims for No-Fault Benefits submitted through the Corporate Provider Defendants; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the Corporate Provider Defendants, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through the Corporate Provider Defendants, or else to request additional verification of those claims, has not expired.

242. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

243. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 242 above.

244.    There is an actual case in controversy between GEICO and the Defendants concerning more than $1,825,000.00 in fraudulent billing for the Fraudulent Diagnostic Tests that have been submitted to GEICO.

245.    The Corporate Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Corporate Provider Defendants are not authorized or properly licensed to render or bill for healthcare services in New York.

246.    The Corporate Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Diagnostic Tests have been provided – to the extent that they have been provided at all – pursuant to illegal kickback, fee splitting, and payment for referral arrangements, between the Defendants and the Referring Practitioners.

247.    The Corporate Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Diagnostic Tests have been interpreted – to the extent they have been interpreted at all – by persons not authorized to render healthcare services in New York.

248.    The Corporate Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Diagnostic Tests have not been medically necessary, are worthless in the manner employed by Defendants, and performed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly are subjected to them.

249.    The Corporate Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in the vast majority of cases, the Fraudulent Diagnostic Tests have been interpreted – to the extent that they have been interpreted at all – by independent contractors, rather than by the Corporate Provider Defendants' employees.

47

250. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO because:

(i)      the Corporate Provider Defendants are not authorized or properly licensed to render or bill for healthcare services in New York and, therefore, are ineligible to bill for or collect No-Fault Benefits;

(ii)     the Fraudulent Diagnostic Tests have been provided – to the extent that they have been provided at all – pursuant to illegal kickback, fee splitting, and payment for referral arrangements between the Defendants and the Referring Practitioners, and, therefore, the Corporate Provider Defendants are ineligible to bill for or collect No-Fault Benefits;

(iii)    in many cases, the Fraudulent Diagnostic Tests have been interpreted – to the extent they have been interpreted at all – by persons not authorized to render healthcare services in New York, and, therefore, the Corporate Provider Defendants are ineligible to bill for or collect No-Fault Benefits for such tests;

(iv)     the Fraudulent Diagnostic Tests have not been medically necessary, are worthless in the manner employed by Defendants, and performed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly are subjected to them, and, therefore, the Corporate Provider Defendants are ineligible to bill for or collect No-Fault Benefits for such tests;

(v)      in the vast majority of cases, the Fraudulent Diagnostic Tests have been interpreted – to the extent they have been interpreted at all – by independent contractors, rather than by the Corporate Provider Defendants' employees and, therefore, the Corporate Provider Defendants are ineligible to bill for or collect No-Fault Benefits for such tests; and

(vi)     Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology Partners, and American Neurology have not received a certificate of authority to do business in New York, Progressive, Spectrum, Omega, Meridian, Premier Professional, Comprehensive Medical, Premier Health, New Wave, Neurology & Radiology Partners, and American Neurology therefore may not maintain any action, suit, or special proceeding in any court of New York seeking to collect No-Fault Benefits.

## SECOND CAUSE OF ACTION
### Against Rubin
### (Violation of RICO, 18 U.S.C. § 1962(c))

251.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 250 above.

252.   Progressive Diagnostic, Inc. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

253.   Rubin knowingly has conducted and/or participated, directly or indirectly, in the conduct of Progressive's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Progressive was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services, in many cases, have been interpreted by persons not authorized to render healthcare services in New York; (v) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (vi) the billed-for services have been interpreted by independent contractors, rather than by Progressive's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

254.   Progressive's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are

49

the regular way in which Rubin operates Progressive, insofar as Progressive never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Progressive to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Progressive to the present day.

255.    Progressive is engaged in inherently unlawful acts, inasmuch as it illegally renders healthcare services in New York, unlawfully pays for patient referrals, and illegally splits fees. These inherently unlawful acts are taken by Progressive in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

256.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $24,000.00 pursuant to the fraudulent charges submitted by the Defendants through Progressive.

257.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Rubin, Davis, Mendelson, and Grossman**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

258.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 257 above.

259.    Progressive Diagnostic, Inc. is an ongoing "enterprise", as that term is defined in 18 U.S.C. §§ 1961(4), that engaged in activities which affected interstate commerce.

50

260.    Rubin, Davis, Mendelson, and Grossman are associated with the Progressive enterprise.

261.    Rubin, Davis, Mendelson, and Grossman knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Progressive's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U. S. C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Progressive was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services, in many cases, have been interpreted by persons not authorized to render healthcare services in New York; (v) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (vi) the billed-for services have been interpreted by independent contractors, rather than by Progressive's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1." Each such mailing was made in furtherance of the mail fraud scheme.

262.    Rubin, Davis, Mendelson, and Grossman knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent chargers to GEICO.

263.   GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $24,000.00 pursuant to the fraudulent charges submitted by the Defendants through Progressive.

264.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Progressive and Rubin
### (Common Law Fraud)

265.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 264 above.

266.   Progressive and Rubin intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

267.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Progressive has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render healthcare services in New York and has been owned and controlled by an unlicensed, non-professional; (ii) in every claim, the representation that Progressive has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it engages in illegal fee splitting; (iii) in every claim, the representation that Progressive has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich the Defendants; (v) in every claim, the representation that the billed-for services have been performed by Progressive's employees, when in fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors; and (vi) in many claims, the representation that the billed-for services have been interpreted by healthcare professionals authorized to practice in New York, when in fact the billed-for services have been interpreted by healthcare professionals not authorized to practice in New York.

268.    Progressive and Rubin intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Progressive that were not compensable under the No-Fault Laws.

269.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $24,000.00 pursuant to the fraudulent charges submitted by the Defendants through Progressive.

270.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

271.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Davis, Mendelson, and Grossman
### (Aiding and Abetting)

272.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 271 above.

273.    Davis, Mendelson, and Grossman knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by Progressive and Rubin. The acts of Davis, Mendelson, and Grossman in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing Progressive and Rubin to use their license numbers so that Progressive and Rubin could bill GEICO for the Fraudulent Diagnostic Tests.

274.    The conduct of Davis, Mendelson, and Grossman in furtherance of the fraudulent scheme is significant and material. The conduct of Davis, Mendelson, and Grossman is a necessary part of and is critical to the success of the fraudulent scheme because without Davis', Mendelson's, and Grossman's actions, Progressive and Rubin could not render healthcare services and could not submit charges to GEICO and other insurers.

275.    Davis, Mendelson, and Grossman aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Progressive and Rubin for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Davis, Mendelson, and Grossman sought to continue profiting through the fraudulent scheme.

276.    The conduct of Davis, Mendelson, and Grossman caused GEICO to pay at least $24,000.00 pursuant to the fraudulent charges submitted by the Defendants through Progressive.

54

277.    The extensive fraudulent conduct of Davis, Mendelson, and Grossman demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

278.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Progressive, Rubin, Davis, Mendelson, and Grossman**
**(Unjust Enrichment)**

279.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 278 above.

280.    As set forth above, Progressive, Rubin, Davis, Mendelson, and Grossman have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

281.    When GEICO paid the charges submitted by or on behalf of Progressive for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

282.    Progressive, Rubin, Davis, Mendelson, and Grossman have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

283.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

284.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $24,000.00.

### SEVENTH CAUSE OF ACTION
**Against Clear Image and Rubin**
**(Common Law Fraud)**

285.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 284 above.

286.     Clear Image and Rubin intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

287.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Clear Image has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render healthcare services in New York and has been owned and controlled by an unlicensed, non-professional; (ii) in every claim, the representation that Clear Image has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it engages in illegal fee-splitting; (iii) in every claim, the representation that Clear Image has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich the Defendants; and (v) in every claim, the representation that the billed-for services have been

performed by Clear Image's employees, when in fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors.

288.    Clear Image and Rubin intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Clear Image that were not compensable under the No-Fault Laws.

289.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $12,800.00 pursuant to the fraudulent charges submitted by the Defendants through Clear Image. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

290.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

291.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**Against Davis and Mendelson**
**(Aiding and Abetting)**

292.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 291 above.

293.    Davis and Mendelson knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by Clear Image and Rubin. The acts of Davis and Mendelson in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing Clear Image and Rubin to use their

license numbers so that Clear Image and Rubin could bill GEICO for the Fraudulent Diagnostic Tests.

294.     The conduct of Davis and Mendelson in furtherance of the fraudulent scheme is significant and material. The conduct of Davis and Mendelson is a necessary part of and is critical to the success of the fraudulent scheme because without Davis' and Mendelson's actions, Clear Image and Rubin could not render healthcare services and could not submit charges to GEICO and other insurers.

295.     Davis and Mendelson aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Clear Image and Rubin for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Davis and Mendelson sought to continue profiting through the fraudulent scheme.

296.     The conduct of Davis and Mendelson caused GEICO to pay at least $12,800.00 pursuant to the fraudulent charges submitted by the Defendants through Clear Image.

297.     The extensive fraudulent conduct of Davis and Mendelson demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

298.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Clear Image, Rubin, Davis, and Mendelson**
**(Unjust Enrichment)**

299.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 298 above.

300.   As set forth above, Clear Image, Rubin, Davis, and Mendelson have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

301.   When GEICO paid the charges submitted by or on behalf of Clear Image for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

302.   Clear Image, Rubin, Davis, and Mendelson have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

303.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

304.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $12,800.00.

### TENTH CAUSE OF ACTION
**Against Goldstein**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

305.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 304 above.

306.   Spectrum Neurology Group, LLC and Omega Neurological Associates, LLC have overlapping identities, share the same tax identification number, and together (the "Spectrum-Omega Enterprise") amount to an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

307.   Goldstein knowingly has conducted and/or participated, directly or indirectly, in the conduct of the Spectrum-Omega Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon

the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for nearly two years seeking payments that the Spectrum-Omega Enterprise was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services, in many cases, have been interpreted by persons not authorized to render healthcare services in New York; (v) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich the Defendants; and (vi) the billed-for services have been interpreted by independent contractors, rather than by employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

308.    The Spectrum-Omega Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Goldstein operates the Spectrum-Omega Enterprise, insofar as the Spectrum-Omega Enterprise never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for the Spectrum-Omega Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Spectrum-Omega Enterprise to the present day.

309.    The Spectrum-Omega Enterprise is engaged in inherently unlawful acts, inasmuch as it illegally renders healthcare services in New York, unlawfully pays for patient referrals, and illegally splits fees. These inherently unlawful acts are taken by the Spectrum-Omega Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

310.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $17,100.00 pursuant to the fraudulent charges submitted by the Defendants through the Spectrum-Omega Enterprise.

311.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Goldstein, Davis, Mendelson, and Connor**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

312.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 311 above.

313.    The Spectrum-Omega Enterprise is an ongoing "enterprise", as that term is defined in 18 U.S.C. §§ 1961(4), that engaged in activities which affected interstate commerce.

314.    Goldstein, Davis, Mendelson, and Connor are associated with the Spectrum-Omega Enterprise.

315.    Goldstein, Davis, Mendelson, and Connor knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Spectrum-Omega Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United

States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for nearly two years seeking payments that the Spectrum-Omega Enterprise was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services, in many cases, have been interpreted by persons not authorized to render healthcare services in New York; (v) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich the Defendants; and (vi) the billed-for services have been interpreted by independent contractors, rather than by employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3." Each such mailing was made in furtherance of the mail fraud scheme.

316.    Goldstein, Davis, Mendelson, and Connor knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent chargers to GEICO.

317.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $17,100.00 pursuant to the fraudulent charges submitted by the Defendants through the Spectrum-Omega Enterprise.

318.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Spectrum, Omega and Goldstein**
**(Common Law Fraud)**

319. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 318 above.

320. Spectrum, Omega and Goldstein intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

321. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Spectrum and Oemga have been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact they have not been authorized to render healthcare services in New York and has been owned and controlled by an unlicensed, non-professional; (ii) in every claim, the representation that Spectrum and Omega have been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact they have not been properly licensed in that they engage in illegal fee-splitting; (iii) in every claim, the representation that Spectrum and Omega have been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact they have not been properly licensed in that they pay kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; (v) in every claim, the representation that the billed-for services have been performed by Spectrum's and Omega's employees, when in

fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors; and (vi) in many claims, the representation that the billed-for services have been interpreted by healthcare professionals authorized to practice in New York, when in fact the billed-for services have been interpreted by healthcare professionals not authorized to practice in New York.

322.     Spectrum, Omega and Goldstein intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Spectrum and Omega that were not compensable under the No-Fault Laws.

323.     GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $17,100.00 pursuant to the fraudulent charges submitted by the Defendants through Spectrum and Omega.

324.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

325.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against Davis, Mendelson, and Connor**
**(Aiding and Abetting)**

326.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 325 above.

327.     Davis, Mendelson, and Connor knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by Spectrum, Omega and Goldstein. The acts of

Davis, Mendelson, and Connor in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing Spectrum, Omega and Goldstein to use their license numbers so that Spectrum, Omega and Goldstein could bill GEICO for the Fraudulent Diagnostic Tests.

328.    The conduct of Davis, Mendelson, and Connor in furtherance of the fraudulent scheme is significant and material. The conduct of Davis, Mendelson, and Connor is a necessary part of and is critical to the success of the fraudulent scheme because without Davis', Mendelson's, and Connor's actions, Spectrum, Omega and Goldstein could not render healthcare services and could not submit charges to GEICO and other insurers.

329.    Davis, Mendelson, and Connor aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Spectrum, Omega and Goldstein for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Davis, Mendelson, and Connor sought to continue profiting through the fraudulent scheme.

330.    The conduct of Davis, Mendelson, and Connor caused GEICO to pay at least $17,100.00 pursuant to the fraudulent charges submitted by the Defendants through Spectrum and Omega.

331.    The extensive fraudulent conduct of Davis, Mendelson, and Connor demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

332.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against Spectrum, Omega, Goldstein, Davis, Mendelson, and Connor
### (Unjust Enrichment)

333.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 332 above.

334.    As set forth above, Spectrum, Omega, Goldstein, Davis, Mendelson, and Connor have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

335.    When GEICO paid the charges submitted by or on behalf of Spectrum and Omega for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

336.    Spectrum, Omega, Goldstein, Davis, Mendelson, and Connor have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

337.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

338.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $17,100.00.

## FIFTEENTH CAUSE OF ACTION
### Against Goldstein
### (Violation of RICO, 18 U.S.C. § 1962(c))

339.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 338 above.

340.    Meridian Radiology Associates, LLC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

341.    Goldstein knowingly has conducted and/or participated, directly or indirectly, in the conduct of Meridian's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over a year seeking payments that Meridian was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (iv) the billed-for services have been interpreted by independent contractors, rather than by Meridian's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

342.    Meridian's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Goldstein operates Meridian, insofar as Meridian never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Meridian to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Meridian to the present day.

343.   Meridian is engaged in inherently unlawful acts, inasmuch as it illegally renders healthcare services in New York and unlawfully pays for patient referrals. These inherently unlawful acts are taken by Meridian in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

344.   GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $81,500.00 pursuant to the fraudulent charges submitted by the Defendants through Meridian.

345.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Goldstein, Davis, Mendelson, and Landfield
### (Violation of RICO, 18 U.S.C. § 1962(d))

346.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 345 above.

347.   Meridian Radiology Associates, LLC is an ongoing "enterprise", as that term is defined in 18 U.S.C. §§ 1961(4), that engaged in activities which affected interstate commerce.

348.   Goldstein, Davis, Mendelson, and Landfield are associated with the Meridian enterprise.

349.   Goldstein, Davis, Mendelson, and Landfield knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Meridian's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over a year

seeking payments that Meridian was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (iv) the billed-for services have been interpreted by independent contractors, rather than by Meridian's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4." Each such mailing was made in furtherance of the mail fraud scheme.

350.    Goldstein, Davis, Mendelson, and Landfield knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent chargers to GEICO.

351.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $81,500.00 pursuant to the fraudulent charges submitted by the Defendants through Meridian.

352.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against Meridian and Goldstein
### (Common Law Fraud)

353.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 352 above.

354.     Meridian and Goldstein intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

355.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Meridian has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render healthcare services in New York and has been owned and controlled by an unlicensed, non-professional; (ii) in every claim, the representation that Meridian has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich the Defendants; and (iv) in every claim, the representation that the billed-for services have been performed by Meridian's employees, when in fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors.

356.   Meridian and Goldstein intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Meridian that were not compensable under the No-Fault Laws.

357.   GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $81,500.00 pursuant to the fraudulent charges submitted by the Defendants through Meridian.

358.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

359.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**Against Davis, Mendelson, and Landfield**
**(Aiding and Abetting)**

360.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 359 above.

361.   Davis, Mendelson, and Landfield knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by Meridian and Goldstein. The acts of Davis, Mendelson, and Landfield in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing Meridian and Goldstein to use their license numbers so that Meridian and Goldstein could bill GEICO for the Fraudulent Diagnostic Tests.

362.   The conduct of Davis, Mendelson, and Landfield in furtherance of the fraudulent scheme is significant and material. The conduct of Davis, Mendelson, and Landfield is a

necessary part of and is critical to the success of the fraudulent scheme because without Davis', Mendelson's, and Landfield's actions, Meridian and Goldstein could not render healthcare services and could not submit charges to GEICO and other insurers.

363.    Davis, Mendelson, and Landfield aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Meridian and Goldstein for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Davis, Mendelson, and Landfield sought to continue profiting through the fraudulent scheme.

364.    The conduct of Davis, Mendelson, and Landfield caused GEICO to pay at least $81,500.00 pursuant to the fraudulent charges submitted by the Defendants through Meridian.

365.    The extensive fraudulent conduct of Davis, Mendelson, and Landfield demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

366.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against Meridian, Goldstein, Davis, Mendelson, and Landfield**
**(Unjust Enrichment)**

367.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 366 above.

368.    As set forth above, Meridian, Goldstein, Davis, Mendelson, and Landfield have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

369.   When GEICO paid the charges submitted by or on behalf of Meridian for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

370.   Meridian, Goldstein, Davis, Mendelson, and Landfield have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

371.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

372.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $81,500.00.

**TWENTIETH CAUSE OF ACTION**
**Against Goldstein**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

373.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 372 above.

374.   Premier Professional Services, LLC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

375.   Goldstein knowingly has conducted and/or participated, directly or indirectly, in the conduct of Premier Professional's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over seven years seeking payments that Premier Professional was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been

performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) the billed-for services have been interpreted by independent contractors, rather than by Premier Professional's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

376. Premier Professional's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud were the regular way in which Goldstein operates Premier Professional, insofar as Premier Professional never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore have been essential in order for Premier Professional to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Premier Professional to the present day.

377. Premier Professional has engaged in inherently unlawful acts, inasmuch as it illegally renders healthcare services in New York, unlawfully pays for patient referrals, and illegally splits fees. These inherently unlawful acts are taken by Premier Professional in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

378.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $147,600.00 pursuant to the fraudulent charges submitted by the Defendants through Premier Professional.

379.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against Goldstein, Davis, and Mendelson**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

380.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 379 above.

381.    Premier Professional Services, LLC is an ongoing "enterprise", as that term is defined in 18 U.S.C. §§ 1961(4), that engaged in activities which affected interstate commerce.

382.    Goldstein, Davis, and Mendelson are associated with the Premier Professional enterprise.

383.    Goldstein, Davis, and Mendelson knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Premier Professional's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S. C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over seven years seeking payments that Premier Professional was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally split fees; (iv) the billed-for services have not been

medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) the billed-for services have been interpreted by independent contractors, rather than by Premier Professional's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5." Each such mailing was made in furtherance of the mail fraud scheme.

384.    Goldstein, Davis, and Mendelson knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent chargers to GEICO.

385.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $147,600.00 pursuant to the fraudulent charges submitted by the Defendants through Premier Professional.

386.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-SECOND CAUSE OF ACTION**
**Against Premier Professional and Goldstein**
**(Common Law Fraud)**

387.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 386 above.

388.    Premier Professional and Goldstein intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

389.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Premier Professional was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render healthcare services in New York and has been owned and controlled by unlicensed, non-professionals; (ii) in every claim, the representation that Premier Professional was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it engages in illegal fee-splitting; (iii) in every claim, the representation that Premier Professional was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich the Defendants; and (v) in every claim, the representation that the billed-for services have been performed by Premier Professional's employees, when in fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors.

390.    Premier Professional and Goldstein intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Premier Professional that were not compensable under the No-Fault Laws.

391.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $147,600.00 pursuant to the fraudulent charges submitted by the Defendants through Premier Professional.

392.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

393.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## TWENTY-THIRD CAUSE OF ACTION
### Against Davis and Mendelson
### (Aiding and Abetting)

394.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 393 above.

395.    Davis and Mendelson knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by Premier Professional and Goldstein. The acts of Davis and Mendelson in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing Premier Professional and Goldstein to use their license numbers so that Premier Professional and Goldstein could bill GEICO for the Fraudulent Diagnostic Tests.

396.    The conduct of Davis and Mendelson in furtherance of the fraudulent scheme is significant and material. The conduct of Davis and Mendelson is a necessary part of and is critical to the success of the fraudulent scheme because without Davis' and Mendelson's actions, Premier Professional and Goldstein could not render healthcare services and could not submit charges to GEICO and other insurers.

397.    Davis and Mendelson aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Premier Professional and Goldstein for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Davis and Mendelson sought to continue profiting through the fraudulent scheme.

398.    The conduct of Davis and Mendelson caused GEICO to pay at least $147,600.00 pursuant to the fraudulent charges submitted by the Defendants through Premier Professional.

399.    The extensive fraudulent conduct of Davis and Mendelson demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

400.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
**Against Premier Professional, Goldstein, Davis, and Mendelson**
**(Unjust Enrichment)**

401.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 400 above.

402.    As set forth above, Premier Professional, Goldstein, Davis, and Mendelson have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

403.    When GEICO paid the charges submitted by or on behalf of Premier Professional for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

404.    Premier Professional, Goldstein, Davis, and Mendelson have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

405.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

406.    By reason of the above, the Defendants were unjustly enriched in an amount to be determined at trial, but in no event less than $147,600.00.

### TWENTY-FIFTH CAUSE OF ACTION
#### Against Comprehensive Medical and Goldstein
#### (Common Law Fraud)

407.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 406 above.

408.    Comprehensive Medical and Goldstein intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

409.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Comprehensive Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not authorized to render healthcare services in New York and was owned and controlled by an unlicensed, non-professional; (ii) in every claim, the representation that Comprehensive Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it engaged in illegal fee-splitting; (iii) in every claim, the representation that Comprehensive

Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it paid kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were useless, and were performed solely to financially enrich Defendants; and (v) in every claim, the representation that the billed-for services were performed by Comprehensive Medical's employees, when in fact the billed-for services were interpreted – to the extent they were interpreted at all – by independent contractors.

410. Comprehensive Medical and Goldstein intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Comprehensive Medical that were not compensable under the No-Fault Laws.

411. GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $134,200.00 pursuant to the fraudulent charges submitted by the Defendants through Comprehensive Medical. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6."

412. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

413. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### TWENTY-SIXTH CAUSE OF ACTION
**Against Comprehensive Medical and Goldstein**
**(Unjust Enrichment)**

414.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 413 above.

415.    As set forth above, Comprehensive Medical and Goldstein engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

416.    When GEICO paid the charges submitted by or on behalf of Comprehensive Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

417.    Comprehensive Medical and Goldstein were enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

418.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

419.    By reason of the above, the Defendants were unjustly enriched in an amount to be determined at trial, but in no event less than $134,200.00.

### TWENTY-SEVENTH CAUSE OF ACTION
**Against Goldstein and Dena**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

420.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 419 above.

421.    Premier Health Services, LLC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

422.   Goldstein and Dena knowingly have conducted and/or participated, directly or indirectly, in the conduct of Premier Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over seven years seeking payments that Premier Health was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) the billed-for services have been interpreted by independent contractors, rather than by Premier Health's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7."

423.   Premier Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud were the regular way in which Goldstein and Dena operate Premier Health, insofar as Premier Health never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore have been essential in order for Premier Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Premier Health to the present day.

424.    Premier Health has engaged in inherently unlawful acts, inasmuch as it illegally renders healthcare services in New York, unlawfully pays for patient referrals, and illegally splits fees. These inherently unlawful acts are taken by Premier Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

425.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $353,800.00 pursuant to the fraudulent charges submitted by the Defendants through Premier Health.

426.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTY-EIGHTH CAUSE OF ACTION
**Against Goldstein, Dena, Davis, and Mendelson**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

427.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 426 above.

428.    Premier Health Services, LLC is an ongoing "enterprise", as that term is defined in 18 U.S.C. §§ 1961(4), that engaged in activities which affected interstate commerce.

429.    Goldstein, Dena, Davis, and Mendelson are associated with the Premier Health enterprise.

430.    Goldstein, Dena, Davis, and Mendelson knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Premier Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or

cause to be submitted hundreds of fraudulent charges on a continuous basis for over seven years seeking payments that Premier Health was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally split fees; (iv) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) the billed-for services have been interpreted by independent contractors, rather than by Premier Health's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7." Each such mailing was made in furtherance of the mail fraud scheme.

431.    Goldstein, Dena, Davis, and Mendelson knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent chargers to GEICO.

432.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $353,800.00 pursuant to the fraudulent charges submitted by the Defendants through Premier Health.

433.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Premier Health, Goldstein, and Dena
### (Common Law Fraud)

434.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 433 above.

435.    Premier Health, Goldstein, and Dena intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

436.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Premier Health was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render healthcare services in New York and has been owned and controlled by unlicensed, non-professionals; (ii) in every claim, the representation that Premier Health was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it engages in illegal fee-splitting; (iii) in every claim, the representation that Premier Health was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich the Defendants; and (v) in every claim, the representation that the billed-for services have been

performed by Premier Health's employees, when in fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors.

437.     Premier Health Goldstein, and Dena intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Premier Health that were not compensable under the No-Fault Laws.

438.     GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $353,800.00 pursuant to the fraudulent charges submitted by the Defendants through Premier Health.

439.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

440.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## THIRTIETH CAUSE OF ACTION
### Against Davis and Mendelson
### (Aiding and Abetting)

441.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 440 above.

442.     Davis and Mendelson knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by Premier Health, Goldstein, and Dena. The acts of Davis and Mendelson in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing Premier Health,

Goldstein, and Dena to use their license numbers so that Premier Health, Goldstein, and Dena could bill GEICO for the Fraudulent Diagnostic Tests.

443.    The conduct of Davis and Mendelson in furtherance of the fraudulent scheme is significant and material. The conduct of Davis and Mendelson is a necessary part of and is critical to the success of the fraudulent scheme because without Davis' and Mendelson's actions, Premier Health, Goldstein, and Dena  could not render healthcare services and could not submit charges to GEICO and other insurers.

444.    Davis and Mendelson aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Premier Health, Goldstein, and Dena for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Davis and Mendelson sought to continue profiting through the fraudulent scheme.

445.    The conduct of Davis and Mendelson caused GEICO to pay at least $353,800.00 pursuant to the fraudulent charges submitted by the Defendants through Premier Health.

446.    The extensive fraudulent conduct of Davis and Mendelson demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

447.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## THIRTY-FIRST CAUSE OF ACTION
### Against Premier Health, Goldstein, Dena, Davis, and Mendelson
### (Unjust Enrichment)

448.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 447 above.

449.    As set forth above, Premier Health, Goldstein, Dena, Davis, and Mendelson have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

450.    When GEICO paid the charges submitted by or on behalf of Premier Health for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

451.    Premier Health, Goldstein, Dena, Davis, and Mendelson have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

452.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

453.    By reason of the above, the Defendants were unjustly enriched in an amount to be determined at trial, but in no event less than $353,800.00.

## THIRTY-SECOND CAUSE OF ACTION
### Against Skolnik
### (Violation of RICO, 18 U.S.C. § 1962(c))

454.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 453 above.

455.    The Neuro Group, LLC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

456.    Skolnik knowingly has conducted and/or participated, directly or indirectly, in the conduct of the Neuro Group's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over a year seeking payments that the Neuro Group was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) the billed-for services have been interpreted by independent contractors, rather than by the Neuro Group's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8."

457.    The Neuro Group's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Skolnik operates the Neuro Group, insofar as the Neuro Group never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for the Neuro Group to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Neuro Group to the present day.

458.    The Neuro Group is engaged in inherently unlawful acts, inasmuch as it illegally renders healthcare services in New York, unlawfully pays for patient referrals, and illegally splits fees. These inherently unlawful acts are taken by the Neuro Group in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

459.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $64,400.00 pursuant to the fraudulent charges submitted by the Defendants through the Neuro Group.

460.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRTY-THIRD CAUSE OF ACTION
### Against Skolnik, Davis, and Nizar
### (Violation of RICO, 18 U.S.C. § 1962(d))

461.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 460 above.

462.    The Neuro Group, LLC is an ongoing "enterprise", as that term is defined in 18 U.S.C. §§ 1961(4), that engaged in activities which affected interstate commerce.

463.    Skolnik, Davis, and Nizar are associated with the Neuro Group enterprise.

464.    Skolnik, Davis, and Nizar knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Neuro Group's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S. C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over a year seeking

payments that the Neuro Group was not eligible to receive under the No-Fault Laws because: (i) it has not been authorized or properly licensed to render healthcare services in New York; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) the billed-for services have been interpreted by independent contractors, rather than by the Neuro Group's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8." Each such mailing was made in furtherance of the mail fraud scheme.

465.   Skolnik, Davis, and Nizar knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent chargers to GEICO.

466.   GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $64,400.00 pursuant to the fraudulent charges submitted by the Defendants through the Neuro Group.

467.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRTY-FOURTH CAUSE OF ACTION
### Against the Neuro Group and Skolnik
### (Common Law Fraud)

468.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 467 above.

469.    The Neuro Group and Skolnik intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

470.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Neuro Group has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render healthcare services in New York and has been owned and controlled by an unlicensed, non-professional; (ii) in every claim, the representation that the Neuro Group has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it engages in illegal fee-splitting; (iii) in every claim, the representation that the Neuro Group has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) in every claim, the representation that the billed-for services have been performed by the Neuro Group's employees, when in fact the billed-for

services have been interpreted – to the extent they have been interpreted at all – by independent contractors.

471.    The Neuro Group and Skolnik intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Neuro Group that were not compensable under the No-Fault Laws.

472.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $64,400.00 pursuant to the fraudulent charges submitted by the Defendants through the Neuro Group.

473.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

474.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**THIRTY-FIFTH CAUSE OF ACTION**
**Against Davis and Nizar**
**(Aiding and Abetting)**

475.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 474 above.

476.    Davis and Nizar knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by the Neuro Group and Skolnik. The acts of Davis and Nizar in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing the Neuro Group and Skolnik to use

their license numbers so that the Neuro Group and Skolnik could bill GEICO for the Fraudulent Diagnostic Tests.

477.    The conduct of Davis and Nizar in furtherance of the fraudulent scheme is significant and material. The conduct of Davis and Nizar is a necessary part of and is critical to the success of the fraudulent scheme because without Davis' and Nizar'sactions, the Neuro Group and Skolnik could not render healthcare services and could not submit charges to GEICO and other insurers.

478.    Davis and Nizar aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to the Neuro Group and Skolnik for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Davis and Nizar sought to continue profiting through the fraudulent scheme.

479.    The conduct of Davis and Nizar caused GEICO to pay at least $64,400.00 pursuant to the fraudulent charges submitted by the Defendants through the Neuro Group.

480.    The extensive fraudulent conduct of Davis and Nizar demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

481.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## THIRTY-SIXTH CAUSE OF ACTION
### Against the Neuro Group, Skolnik, Davis, and Nizar
### (Unjust Enrichment)

482.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 481 above.

483.    As set forth above, the Neuro Group, Skolnik, Davis, and Nizar have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

484.    When GEICO paid the charges submitted by or on behalf of the Neuro Group for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

485.    The Neuro Group, Skolnik, Davis, and Nizar have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

486.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

487.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $64,400.00.

### THIRTY-SEVENTH CAUSE OF ACTION
**Against New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor**
**(Common Law Fraud)**

488.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 487 above.

489.    New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

490.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that New Wave has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render

healthcare services in New York and has been owned and controlled by unlicensed, non-professionals; (ii) in every claim, the representation that New Wave has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it engages in illegal fee-splitting; (iii) in every claim, the representation that New Wave has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) in every claim, the representation that the billed-for services have been performed by New Wave's employees, when in fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors.

491. New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through New Wave that were not compensable under the No-Fault Laws.

492. GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $6,500.00 pursuant to the fraudulent charges submitted by the Defendants through New Wave. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9."

493.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

494.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## THIRTY-EIGHTH CAUSE OF ACTION
### Against Nizar
### (Aiding and Abetting)

495.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 494 above.

496.    Nizar knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor. The acts of Nizar in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor to use their license numbers so that New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor could bill GEICO for the Fraudulent Diagnostic Tests.

497.    The conduct of Nizar in furtherance of the fraudulent scheme is significant and material. The conduct of Nizar is a necessary part of and is critical to the success of the fraudulent scheme because without Nizar's actions, New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor could not render healthcare services and could not submit charges to GEICO and other insurers.

498.    Nizar aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor for medically unnecessary and illegal healthcare services that were not compensable under New

98

York's No-Fault Laws because Nizar sought to continue profiting through the fraudulent scheme.

499.    The conduct of Nizar caused GEICO to pay at least $6,500.00 pursuant to the fraudulent charges submitted by the Defendants through New Wave.

500.    The extensive fraudulent conduct of Nizar demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

501.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**THIRTY-NINTH CAUSE OF ACTION**
**Against New Wave, Eby, Whitney, Mrs. Mantor, Mr. Mantor, and Nizar**
**(Unjust Enrichment)**

502.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 501 above.

503.    As set forth above, New Wave, Eby, Whitney, Mrs. Mantor, Mr. Mantor, and Nizar have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

504.    When GEICO paid the charges submitted by or on behalf of New Wave for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

505.    New Wave, Eby, Whitney, Mrs. Mantor, Mr. Mantor, and Nizar have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

99

506.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

507.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $6,500.00

### FORTIETH CAUSE OF ACTION
**Against Goldstein and Landfield**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

508.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 507 above.

509.   Palmer Medical P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

510.   Goldstein and Landfield knowingly have conducted and/or participated, directly or indirectly, in the conduct of Palmer's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for nearly a year seeking payments that Palmer was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and has been owned and controlled by unlicensed, non-professionals; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) the billed-for services have been interpreted by independent contractors, rather than by Palmer's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise,

in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10."

511. Palmer's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Goldstein and Landfield operate Palmer, insofar as Palmer never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Palmer to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Palmer to the present day.

512. Palmer is engaged in inherently unlawful acts, inasmuch as it illegally renders healthcare services in New York, unlawfully pays for patient referrals, and illegally splits fees. These inherently unlawful acts are taken by Palmer in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

513. GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $27,300.00 pursuant to the fraudulent charges submitted by the Defendants through Palmer.

514. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FORTY-FIRST CAUSE OF ACTION
### Against Goldstein, Davis, and Landfield
### (Violation of RICO, 18 U.S.C. § 1962(d))

515.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 514 above.

516.   Palmer Medical PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. §§ 1961(4), that engaged in activities which affected interstate commerce.

517.   Goldstein, Davis, and Landfield are employed by and/or associated with the Palmer enterprise.

518.   Goldstein, Davis, and Landfield knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Palmer's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for nearly a year seeking payments that Palmer was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and has been owned and controlled by unlicensed, non-professionals; (ii) the billed-for services have been performed pursuant to illegal kickback and payment for referral arrangements; (iii) it illegally splits fees; (iv) the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; and (v) the billed-for services have been interpreted by independent contractors, rather than by Palmer's employees. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "10." Each such mailing was made in furtherance of the mail fraud scheme.

519.    Goldstein, Davis, and Landfield knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent chargers to GEICO.

520.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $27,300.00 pursuant to the fraudulent charges submitted by the Defendants through Palmer.

521.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FORTY-SECOND CAUSE OF ACTION
### Against Palmer, Goldstein, and Landfield
### (Common Law Fraud)

522.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 521 above.

523.    Palmer, Goldstein, and Landfield intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

524.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Palmer has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was unlawfully incorporated and has been owned and controlled by an unlicensed, non-professional; (ii) in every claim, the representation that Palmer has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in

fact it has not been properly licensed in that it engages in illegal fee-splitting; (iii) in every claim, the representation that Palmer has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich the Defendants; and (v) in every claim, the representation that the billed-for services have been performed by Palmer's employees, when in fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors.

525. Palmer, Goldstein, and Landfield intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Palmer that were not compensable under the No-Fault Laws.

526. GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $27,300.00 pursuant to the fraudulent charges submitted by the Defendants through Palmer.

527. The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

528. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## FORTY-THIRD CAUSE OF ACTION
### Against Davis
### (Aiding and Abetting)

529.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 528 above.

530.     Davis knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by Palmer, Goldstein, and Landfield. The acts of Davis and Landfield in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing Palmer and Goldstein to use their license numbers so that Palmer and Goldstein could bill GEICO for the Fraudulent Diagnostic Tests.

531.     The conduct of Davis in furtherance of the fraudulent scheme is significant and material. The conduct of Davis is a necessary part of and is critical to the success of the fraudulent scheme because without Davis' actions, Palmer and Goldstein could not render healthcare services and could not submit charges to GEICO and other insurers.

532.     Davis aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Palmer and Goldstein for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Davis and Landfield sought to continue profiting through the fraudulent scheme.

533.     The conduct of Davis caused GEICO to pay at least $27,300.00 pursuant to the fraudulent charges submitted by the Defendants through Palmer.

534.     The extensive fraudulent conduct of Davis  demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

535.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## FORTY-FOURTH CAUSE OF ACTION
### Against Palmer, Goldstein, Davis, and Landfield
### (Unjust Enrichment)

536.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 535 above.

537.   As set forth above, Palmer, Goldstein, Davis, and Landfield have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

538.   When GEICO paid the charges submitted by or on behalf of Palmer for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

539.   Palmer, Goldstein, Davis, and Landfield have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

540.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

541.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $27,300.00.

### FORTY-FIFTH CAUSE OF ACTION
**Against Neurology & Radiology and Packard**
**(Common Law Fraud)**

542.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 541 above.

543.    Neurology & Radiology and Packard intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

544.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Neurology & Radiology has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render healthcare services in New York and has been owned and controlled by an unlicensed professional; (ii) in every claim, the representation that Neurology & Radiology has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it engages in illegal fee-splitting; (iii) in every claim, the representation that Neurology & Radiology has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; (v) in many claims, the representation that the billed-for services have been performed by Neurology & Radiology's employees, when in fact the billed-

107

for services have been interpreted – to the extent they have been interpreted at all – by independent contractors; and (vi) in many claims, the representation that the billed-for services have been interpreted by healthcare professionals authorized to practice in New York, when in fact the billed-for services have been interpreted by healthcare professionals not authorized to practice in New York.

545.    Neurology & Radiology and Packard intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Neurology & Radiology that were not compensable under the No-Fault Laws.

546.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $6,000.00 pursuant to the fraudulent charges submitted by the Defendants through Neurology & Radiology. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11."

547.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

548.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## FORTY-SIXTH CAUSE OF ACTION
### Against Drake
### (Aiding and Abetting)

549.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 548 above.

550.    Drake knowingly aided and abetted the fraudulent scheme that has been perpetrated on GEICO by Neurology & Radiology and Packard. The acts of Drake in furtherance of the fraudulent scheme include: (i) interpreting the Fraudulent Diagnostic Tests; (ii) recommending patient treatments; and (iii) allowing Neurology & Radiology and Packard to use his license number so that Neurology & Radiology and Packard could bill GEICO for the Fraudulent Diagnostic Tests.

551.    The conduct of Drake in furtherance of the fraudulent scheme is significant and material. The conduct of Drake is a necessary part of and is critical to the success of the fraudulent scheme because without Drake's actions, Neurology & Radiology and Packard could not render healthcare services and could not submit charges to GEICO and other insurers.

552.    Drake aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Neurology & Radiology and Packard for medically unnecessary and illegal healthcare services that were not compensable under New York's No-Fault Laws because Drake sought to continue profiting through the fraudulent scheme.

553.    The conduct of Drake caused GEICO to pay at least $6,000.00 pursuant to the fraudulent charges submitted by the Defendants through Neurology & Radiology.

554.    The extensive fraudulent conduct of Drake demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

555.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## FORTY-SEVENTH CAUSE OF ACTION
### Against Neurology & Radiology, Packard, and Drake
### (Unjust Enrichment)

556.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 555 above.

557.    As set forth above, Neurology & Radiology, Packard, and Drake have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

558.    When GEICO paid the charges submitted by or on behalf of Neurology & Radiology for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

559.    Neurology & Radiology, Packard, and Drake have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

560.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

561.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $6,000.00.

## FORTY-EIGHTH CAUSE OF ACTION
### Against American Neurology and Packard
### (Common Law Fraud)

562.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 561 above.

563.   American Neurology and Packard intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of fraudulent charges seeking payment for the Fraudulent Diagnostic Tests.

564.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that American Neurology has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been authorized to render healthcare services in New York and has been owned and controlled by an unlicensed professional; (ii) in every claim, the representation that American Neurology has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it engages in illegal fee-splitting; (iii) in every claim, the representation that American Neurology has been properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it has not been properly licensed in that it pays kickbacks for patient referrals; (iv) in every claim, the representation that the billed-for services have been medically necessary, when in fact the billed-for services have not been medically necessary, have been useless, and have been performed solely to financially enrich Defendants; (v) in many claims, the representation that the billed-for services have been performed by American Neurology's employees, when in fact the billed-for services have been interpreted – to the extent they have been interpreted at all – by independent contractors; and (vi) in many claims, the representation that the billed-for services have been interpreted by healthcare professionals authorized to practice in New York, when in fact the

billed-for services have been interpreted by healthcare professionals not authorized to practice in New York.

565.    American Neurology and Packard intentionally made the above described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through American Neurology that were not compensable under the No-Fault Laws.

566.    GEICO has been injured in its business and property by reason of the above described conduct in that it has paid at least $2,000.00 pursuant to the fraudulent charges submitted by the Defendants through American Neurology. A representative sample of the fraudulent charges and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "12."

567.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

568.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**FORTY-NINTH CAUSE OF ACTION**
**Against American Neurology and Packard**
**(Unjust Enrichment)**

569.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 568 above.

570.    As set forth above, American Neurology and Packard have been engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

571.    When GEICO paid the charges submitted by or on behalf of American Neurology for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

572.    American Neurology and Packard have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

573.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

574.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,000.00.

## JURY DEMAND

575.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance CO., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending charges submitted to GEICO by any of the Corporate Provider Defendants;

B.    On the Second Cause of Action against Rubin, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $24,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Rubin, Davis, Mendelson, and Grossman, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $24,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Progressive and Rubin, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $24,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Davis, Mendelson, and Grossman, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $24,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Progressive, Rubin, Davis, Mendelson, and Grossman, more than $24,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Clear Image and Rubin, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $12,800.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Davis and Mendelson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $12,800.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Clear Image, Rubin, Davis, and Mendelson, more than $12,800.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Goldstein, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $17,100.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Goldstein, Davis, Mendelson, and Connor, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $17,100.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Spectrum, Omega and Goldstein, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $17,100.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Davis, Mendelson, and Connor, ccompensatory damages in favor of GEICO an amount to be determined at trial but in excess of $17,100.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Spectrum, Omega, Goldstein, Davis, Mendelson, and Connor, more than $17,100.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Goldstein, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $81,500.00, together with

115

treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.     On the Sixteenth Cause of Action against Goldstein, Davis, Mendelson, and Landfield, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $81,500.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.     On the Seventeenth Cause of Action against Meridian and Goldstein, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $81,500.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

R.     On the Eighteenth Cause of Action against Davis, Mendelson, and Landfield, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $81,500.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

S.     On the Nineteenth Cause of Action against Meridian, Goldstein, Davis, Mendelson, and Landfield, more than $81,500.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

T.     On the Twentieth Cause of Action against Goldstein, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,600.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.     On the Twenty-First of Action against Goldstein, Davis, and Mendelson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$147,600.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  V. On the Twenty-Second Cause of Action against Premier Professional and Goldstein, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,600.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

  W. On the Twenty-Third Cause of Action against Davis and Mendelson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,600.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

  X. On the Twenty-Fourth Cause of Action against Premier Professional, Goldstein, Davis, and Mendelson, more than $147,600.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

  Y. On the Twenty-Fifth Cause of Action against Comprehensive Medical and Goldstein, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $134,200.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

  Z. On the Twenty-Sixth Cause of Action against Comprehensive Medical and Goldstein, more than $134,200.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

  AA. On the Twenty-Seventh Cause of Action against Goldstein and Dena, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$353,800.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.   On the Twenty-Eighth Cause of Action against Goldstein, Dena, Davis, and Mendelson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $353,800.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.   On the Twenty-Ninth Cause of Action against Premier Health, Goldstein, and Dena, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $353,800.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

DD.   On the Thirtieth Cause of Action against Davis and Mendelson, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $353,800.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

EE.   On the Thirty-First Cause of Action against Premier Health, Goldstein, Dena, Davis, and Mendelson, more than $353,800.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

FF.   On the Thirty-Second Cause of Action against Skolnik, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $64,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

GG.   On the Thirty-Third Cause of Action against Skolnik, Davis, and Nizar, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

118

$64,400.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

HH. On the Thirty-Fourth Cause of Action against Neuro Group and Skolnik, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $64,400.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

II. On the Thirty-Fifth Cause of Action against Davis and Nizar, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $64,400.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

JJ. On the Thirty-Sixth Cause of Action against the Neuro Group, Skolnik, Davis, and Nizar, more than $64,400.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

KK. On the Thirty-Seventh Cause of Action against New Wave, Eby, Whitney, Mrs. Mantor, and Mr. Mantor, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $6,500.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

LL. On the Thirty-Eighth Cause of Action against the Nizar, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $6,500.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

MM.    On the Thirty-Ninth Cause of Action against New Wave, Eby, Whitney, Mrs. Mantor, Mr. Mantor, and Nizar, more than $6,500.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

NN.    On the Fortieth Cause of Action against Goldstein and Landfield, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $27,300.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

OO.    On the Forty-First Cause of Action against Goldstein, Davis, and Landfield, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $27,300.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

PP.    On the Forty-Second Cause of Action against Palmer, Goldstein, and Landfield, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $27,300.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

QQ.    On the Forty-Third Cause of Action against Davis, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $27,300.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

RR.    On the Forty-Fourth Cause of Action against Palmer, Goldstein, Davis, and Landfield, more than $27,300.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

SS.    On the Forty-Fifth Cause of Action against Neurology & Radiology and Packard, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $6,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

TT.    On the Forty-Sixth Cause of Action against Drake, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $6,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

UU.    On the Forty-Seventh Cause of Action against Neurology & Radiology, Packard, and Drake, more than $6,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

VV.    On the Forty-Eighth Cause of Action against American Neurology and Packard, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

WW.    On the Forty-Ninth Cause of Action against American Neurology and Packard, more than $2,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       September 9, 2014

RIVKIN RADLER LLP

By: _____
   Barry I. Levy (BL 2190)
   Michael A. Sirignano (MS 5263)
   Max Gershenoff (MG 4648)

121

926 RXR Plaza
Uniondale, New York 11556-0926
Telephone:     (516) 357-3000
Facsimile:     (516) 357-3333
*Counsel for Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

3010939